CITY OF WATERBURY ET AL. *v.* TOWN
OF WASHINGTON ET AL.
(SC 16509)

Borden, Norcott, Katz, Palmer and Cocco, Js.

508

Argued November 30, 2001—officially released July 2, 2002

*Christopher Rooney,* with whom were *Michael G. Tansley* and *Howard K. Levine,* for the appellant-appellee (named plaintiff).

*William H. Bright, Jr.*, with whom were *William H. Narwold, Holly Winger* and, on the brief, *Charles D. Ray* and *Vanessa D. Roberts*, for the appellees-appellants (named defendant et al.).

*Janet P. Brooks*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Gail S. Shane*, assistant attorney general, for the appellee (intervening defendant attorney general et al.).

*Curtis P. Johnson*, with whom, on the brief, were *Penny H. Anthopolos* and *Dana M. Young*, for the appellee (intervening defendant Connecticut Fund for the Environment, Inc.).

*Robert T. Rimmer* and *Joseph W. Dellapenna* filed a brief for the Connecticut Water Works Association as amicus curiae.

*Opinion*

BORDEN, J. The named plaintiff, the city of Waterbury (Waterbury), appeals[1] and the named defendant, the town of Washington (Washington),[2] cross

---

[1] Waterbury appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] Waterbury brought its complaint for a declaratory judgment against the following defendants: Washington; the town of Roxbury (Roxbury); the Roxbury Land Trust, Inc.; the Shepaug River Association, Inc.; and the Steep Rock Association, Inc. We refer to these parties collectively as the defendants.

In addition, the Connecticut Fund for the Environment, Inc. (fund), intervened as a defendant and asserted several counterclaims against Waterbury. Although the fund's claims were severed when it did not close its pleadings in time for trial, it was permitted to participate in the trial, and filed a brief in this appeal in support of the defendants. The commissioners of public health and of environmental protection, and the state attorney general also intervened, but were not denominated as either plaintiffs or defendants. The attorney general and the department of environmental protection (department) filed a combined brief in this appeal in support of the defendants. Marc F. Greene also intervened as a defendant, appearing pursuant to notice by publication submitted by Waterbury. He filed no pleadings, and adopted and endorsed those filed by the defendants. He has filed nothing

appeals[3] from the judgment of the trial court, rendered after a court trial, granting a permanent injunction in favor of the defendants and enjoining Waterbury's current operation of its water distribution system. In its appeal, Waterbury claims that the trial court improperly concluded that: (1) Waterbury violated the Connecticut Environmental Protection Act (CEPA), General Statutes § 22a-14 et seq.; (2) the relief granted under CEPA did not constitute a taking of Waterbury's vested rights; and (3) Waterbury failed to establish a prescriptive easement to use the waters of the Shepaug River and interfered with the riparian rights of the defendants. In its cross appeal, Washington claims that the remedy ordered by the trial court does not sufficiently cure Waterbury's breach of a certain 1921 agreement between Waterbury and Washington. We conclude that: (1) the trial court utilized an improper standard to determine whether Waterbury violated CEPA; (2) the trial court improperly concluded that Waterbury had not established a prescriptive easement against the riparian rights of the defendants; and (3) our conclusions regarding the CEPA and the riparian rights issues undermine the trial court's ordered remedial release of water, including the remedy ordered on Waterbury's breach of contract claim. Accordingly, we reverse the judgment of the trial court.

---

with this court. The towns of Wolcott, Watertown and Middlebury, which depend on Waterbury for either all or part of their water supply, later intervened as plaintiffs. At closing arguments, the defendants "abandoned any claim for relief based on sales of water to adjoining towns that are already the subject of contracts and that are set forth in [Waterbury's] current water supply plan." Thus, the trial court found no need to address the claims of Wolcott, Watertown and Middlebury, which are not parties to this appeal or cross appeal.

[3] Washington cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the cross appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

Waterbury brought this action, seeking a declaratory judgment that: (1) it has not breached a certain 1921 agreement between it and Washington; (2) it had not unreasonably polluted, impaired or destroyed the public trust, as provided in General Statutes § 22a-16; and (3) its conduct does not constitute a public or private nuisance,[4] or a violation of any existing riparian rights. The defendants counterclaimed that Waterbury had: (1) unreasonably polluted, impaired or destroyed the public trust in the water of the state in violation of § 22a-16; (2) engaged in conduct constituting both a public and private nuisance; see footnote 4 of this opinion; and constituting a violation of the defendants' riparian rights; and (3) breached the 1921 agreement between Waterbury and Washington. After a court trial, the trial court rendered judgment for the defendants.

This case concerns the use of the Shepaug River[5] as a source of Waterbury's and various surrounding

---

[1] The trial court ruled in favor of Waterbury on the issue of whether its actions constituted a public or private nuisance. Washington does not challenge that ruling in its cross appeal.

[5] As described in Shepaug River, Connecticut, A Wild and Scenic River Study, H.R. Doc. No. 96-199, Pt. 7 (1979), the Shepaug River originates in the town of Cornwall. Id., p. 18. There are two branches, east and west. "Both branches flow generally southward before joining to form the border between Warren and Litchfield. The East Branch can best be characterized as a small stream with many swampy areas along its course. . . . Almost half the length of the Shepaug's West Branch is dominated by the 337 acre Cairns Reservoir, which augments the Shepaug Reservoir's storage immediately downstream. The West Branch watershed is free from development and almost totally forested. As the East and West Branches join to form the 96 acre Shepaug Reservoir . . . the setting is one of tranquil beauty. . . . Below the 50 foot high dam which creates the Shepaug Reservoir is a 1/4 mile long pond. It is not until the Shepaug's waters pass this point that they flow in such a manner that meets the free-flowing criterion of the Wild and Scenic Rivers Act. . . . The river [referred to as the West Branch of the Shepaug] continues southward . . . and reaches its confluence with the Bantam River. . . . The Bantam River is the Shepaug's main tributary. . . . Joined now by the Bantam, the Shepaug's main stem continues southward through a narrow, well-defined valley. . . . For three miles, these hillsides are blanketed with hemlocks and hardwoods, and nearly half

towns' water supply, and the effect such use has on the water conditions in the Shepaug River. As the trial court stated, this case pits those that view the Shepaug River as an "abundant and low cost supply of potable water" against those who wish to maintain "the natural condition of a beautiful and nearly pristine river . . . ."

The trial court found the following facts, which are not in dispute. "Waterbury first developed in the low-lying portions of its present location and expanded up the sides of the surrounding hills. The growth of [Waterbury] in the last part of the nineteenth century and the first decades of the twentieth was related to the development of mills and manufacturing. In 1893, the General Assembly authorized Waterbury to increase its water supply by taking water from 'any and all brooks, rivers, ponds, lakes, and reservoirs within the limits of the county of New Haven or the county of Litchfield such supply of water as the necessities or convenience of the inhabitants of said city may require.' [11 Spec. Acts 322, No. 252, § 1 (1893)]. Later enactments excepted Bantam Lake and certain waters of the Nauga-tuck River. [15 Spec. Acts 912, No. 344 (1909) and 17 Spec. Acts 84, No. 101 (1919)].

"Rapid growth in population and some dry years in the first decade of the twentieth century strained [Waterbury's] public water supply. The supply was insufficient at times to maintain pressure to the homes and buildings on the higher elevations, served by the

---

of this is preserved as part of the Steep Rock Association's 'Hidden Valley.' " Id., pp. 18–23. The Shepaug River next passes through the towns of Washington and Roxbury, and eventually ends "in the backwaters of Lake Lillinonah." Id., pp. 23–26.

The area primarily affected by Waterbury's operation of the Shepaug dam is an approximately three mile stretch between the dam and the confluence with the Bantam River. This stretch is known as the west branch of the Shepaug River. This action, however, is concerned with the level of flow throughout the length of the Shepaug River.

'high service' line. The Wigwam Reservoir, built in 1893, was supplemented by the Morris Reservoir, which was under construction from 1910–1913. By 1917, water for both the high service line and the low service line, which serves the downtown area, came directly from these two reservoirs. The Morris and Wigwam reservoirs collect and store water from an eighteen square mile watershed basin known as the Branch Brook basin, through which the Wigwam Brook also runs. (This basin has been variously described during the trial as the 'Wigwam basin' or the 'Branch Brook basin' to distinguish it from the 'Shepaug basin' in the territory from which Waterbury's water supply is derived.)

"The higher in elevation of these two reservoirs is the Morris Reservoir. When the Morris Reservoir is full, at an elevation of 515 feet, the water from that reservoir spills out and flows down to the Wigwam Reservoir, which reaches its overflow point at 424.8 feet of elevation. When the Wigwam Reservoir is full, it spills into the Branch Brook, which eventually empties into the Naugatuck River.

"In 1917, [Waterbury's] engineers reported the need for additional water. [Waterbury] obtained land in the valley of the Shepaug River and built a seven and one-half mile long tunnel to deliver water diverted from that river to its water system in the Wigwam basin.

"[Washington] was wary of [Waterbury's] acquisition of water from the Shepaug River and introduced legislation in the General Assembly to repeal the 1893 [Special] Act. It withdrew the bill upon executing a contract with [Waterbury] on May 3, 1921.[6] By the terms of that

---

[6] The 1921 contract between Washington and Waterbury provided in relevant part: "1. The Town of Washington hereby agrees to withdraw, so far as it is able, the further consideration by the present General Assembly of said House Bill No. 120 and agrees that the same may be adversely reported by the Committee on Cities and Boroughs to which said bill is now referred.

"2. The City of Waterbury agrees that in the event it shall erect a dam on the West Branch of the Shepaug River . . . for the purpose of creating a

contract, [Waterbury] pledged not to reduce the stream flow in the Shepaug River below 1.5 million gallons per day[7] between May 1 and November 1 of each year. [Waterbury] further agreed that 'it will not divert water from the west branch of the Shepaug River at any time when the distributing reservoirs into which the [Waterbury] aqueduct shall convey such water so diverted are full and overflowing.' The 1921 contract provided that [Waterbury] would divert such water only 'to the extent that it may be required to supply the actual needs of the customers of said city and to maintain the storage in its potable water supply reservoir.'

"The Shepaug Reservoir, located behind the Shepaug Dam that was under construction from 1929 to 1933, is located about eight miles west of the reservoirs in the Wigwam basin. The watershed basin for the Shepaug Reservoir is about twenty-eight square miles in size. In 1943, [Waterbury] completed the Pitch Reservoir, into which the flow from the Shepaug tunnel was directed. The Morris Reservoir is immediately downstream from the Pitch, which, in addition to water received from the Shepaug basin through the tunnel, stores runoff from part of the Wigwam basin.

reservoir on said river or in the event that it shall construct an aqueduct and shall divert into it some part of the waters of said West Branch, it will maintain at all times between the period of the first day of May and the first day of November in each year a flow in the said West Branch . . . which flow shall not be less than one and one-half million gallons in each twenty-four hours . . . .

"3. And the City of Waterbury further agrees that it will not divert water from the West Branch of the Shepaug River at any time when the distributing reservoirs into which the city aqueduct shall convey such water so diverted are full and overflowing.

"4. And the City of Waterbury further agrees that it will only divert such water to the extent that may be required to supply the actual needs of the customers of said City and to maintain the storage in its potable water supply reservoirs. . . ."

[7] The abbreviation mgd, which stands for million gallons per day, is used in this opinion.

"In 1963, to increase storage and supply, Waterbury built another dam and reservoir immediately to the north of the Shepaug Reservoir, known as the Cairns Reservoir, with a watershed of approximately ten additional square miles in the Shepaug basin. The Wigwam basin's watershed, at eighteen square miles, is roughly half the size of the Shepaug watershed, which occupies a total of thirty-eight square miles. . . .

"There are, at present, three routes by which water leaves the Shepaug Reservoir: by diversion through the aqueduct tunnel to the Pitch Reservoir, by spillage down the spillway to the Shepaug River when the reservoir is full, and by release from a pipe in a chamber in the dam to the Shepaug River. That pipe, which the witnesses referred to as 'the eight inch pipe,' if left full open releases a maximum flow of approximately 4.9 [mgd] down the Shepaug River. The flow may be considerably lower depending on the head of pressure. . . .

"There is a pool at the foot of the Shepaug Dam. For a substantial distance south of the dam, the land on both sides of the river is owned by Waterbury. Peter's Weir (a small dam) is located a short distance downstream from the dam, and a stream flow gauge has existed in the past at this weir. About three miles below the weir the west branch of the Shepaug River reaches a confluence with the Bantam River, which is located to the east. From the confluence onward, about 50 percent of the summer flow of the Shepaug River is contributed by the Bantam River as measured by Dr. Kenneth Wagner at stream gauges installed in the summer of 1999. The Steep Rock Association, Inc., operates a land trust of about 220 acres located on the Shepaug River both north and south of the confluence with the Bantam River and also in an area on the river north of Washington Depot.

"The town center of Washington Depot is south of the confluence. The river flows south from the Depot

through about 260 riverside acres owned by the Roxbury Land Trust, Inc., along which hiking and other recreational activities are permitted. The parties agree that the stretch of river claimed to be affected by Waterbury's flow diversions is approximately twenty-seven miles in length. . . .

"The method of operating [Waterbury's] water system which gave rise to dissatisfaction, and then to the claims of Washington, Roxbury, and their cocounterclaimants in this suit, began soon after Waterbury built a water treatment plant in 1988 to achieve compliance with water quality standards imposed by the federal government. [Waterbury] located the treatment plant close to the Morris Reservoir, so that water from the Morris and the Pitch could flow to the plant by gravity, without the need for pumping. Water from the Wigwam would have to be pumped uphill to the treatment plant, incurring energy costs. [Waterbury] therefore drew its water almost exclusively from the Pitch and the Morris, with the result that the Wigwam Reservoir filled and either spilled over or was lowered by the release of water from a pipe into the Branch Brook, from which water flowed to the Naugatuck River.

"Another feature of operation from at least 1988 onward was the use of turbines to pump water to the high service areas of the water supply system. The turbines were powered by the flow from the Pitch Reservoir. A high flow or 'head' is required to operate these turbines, and water was diverted from the Shepaug Reservoir through the tunnel in large part to keep the Pitch Reservoir high enough to have the requisite head to power the turbines. If the flow from the Pitch was insufficient, [Waterbury] would have to incur the costs of electrical power to pump to the high service area. . . .

"Official records establish that [Waterbury] operates its water supply system in a manner that results in a

much greater impact on natural resources than is actually necessary to meet the needs of Waterbury's users of water. [Waterbury's] average daily demand is, and has been since 1990 between 16 and 17 [mgd]. This figure includes water sold to the intervenor towns and some other municipal entities. Daily records maintained by [Waterbury], exhibit 514, make it possible to determine how much of the water being sent to the water treatment plant for use in the system on a given day comes from diversion from the Shepaug basin and how much from the Wigwam basin, which has a watershed of approximately half the size of the Shepaug watershed (eighteen square miles vs. thirty-eight square miles). The daily records for the summer months of 1996, the summer before this suit was commenced, show that [Waterbury] was taking between 13.8 and 14.2 [mgd] from the Shepaug on days when the demand, as measured by the amount of water sent to the water treatment plant preparatory to distribution to customers, was between 16 and 18 mgd. This over-reliance on Shepaug diversions occurred on fourteen days in June, 1996, seventeen days in July, 1996, and sixteen days in August, 1996. On some days, [Waterbury] drew 14.2 mgd from the Shepaug when the demand was less than 16 mgd. On many days that summer, [Waterbury] was diverting from the Shepaug even though the Wigwam basin reservoirs were full and spilling.

"Another record of use, exhibit 516, shows that in August, 1996, [Waterbury] used no water from the Wigwam Reservoir, an average of 15.1 mgd from the Pitch and an average of only 3.4 mgd from the Morris Reservoir, while exhibit 514 shows an average daily diversion of 14.4 mgd from the Shepaug River to the Pitch Reservoir. . . .

"[Waterbury's] records indicate that before 1997, [Waterbury] limited the release of water to the Shepaug River between May 1 and November 1 to 1.5 [mgd]."

The trial court also found that "[e]xcept for the dam and reservoirs at the head of its west branch, the Shepaug River is unusually free from the effects of human habitation and development. No highways run along it, and much of the land along its banks is owned by land trusts or public entities or, though privately owned, is wooded and protected by local zoning from development close to its banks. The river is accessible, however, from several public roads, and it is used for hiking, fishing, swimming, seasonal kayaking and canoeing, and scenic enjoyment, especially in the areas owned and reserved for public use by the Steep Rock Association, Inc., and the Roxbury Land Trust, Inc. Use is not restricted to local residents; the court heard eloquent testimony concerning enjoyment derived from the unspoiled beauty of the river from a truck driver from Wolcott who canoes on the river. The roster of users compiled by the Steep Rock Association, Inc., reveals recreational use by people from many parts of Connecticut and other states, including Boy Scout and Girl Scout camping groups. The river flows through the town of Washington Depot and is a source of water for extinguishing fires in that town and on property along its banks.

"For several years residents of the towns along the river and members of the Steep Rock Association, Inc., the Roxbury Land Trust, Inc., and the Shepaug River Association, Inc., have suspected that the diversion of water by [Waterbury] was causing the river to have extremely low flows in summer months, diminishing its natural beauty, reducing it as a habitat for fish and river organisms, and limiting its value for fishing and other recreation. They brought their concerns to the attention of the Connecticut department of environmental protection, which regulates various aspects of natural resources, and to the department of public health, which has jurisdiction over many issues concerning

public water supplies. The state established a task force to study the issues concerning the Shepaug River, but the work of the task force did not lead to a resolution of the conflict between the municipalities. Waterbury and three towns (Wolcott, Middlebury and Watertown) that obtain, or seek to obtain, water from the Waterbury water bureau, perceived the rising criticism as a threat, and both sides to the controversy filed suit in late July, 1997, each seeking injunctive and declaratory relief."

Both cases were transferred to the complex litigation docket, and eventually merged into a single case, in which Waterbury's request to be designated the plaintiff was granted. Waterbury sought a declaratory judgment that its operation of the Shepaug dam did not: (1) constitute a breach of its 1921 contract with Washington; (2) violate CEPA by impairing the public trust; (3) create a public or private nuisance; and (4) violate any riparian rights of the defendants.

The defendants' five count counterclaim alleged that Waterbury's excessive diversions of water from the Shepaug River: (1) violated CEPA by unreasonably polluting, impairing, or destroying the public trust in the water; (2) constituted a public nuisance; (3) constituted a private nuisance; (4) interfered with the riparian rights of the defendants; and (5) constituted a breach of the 1921 contract between Washington and Waterbury.[8]

After a court trial, the trial court found for the defendants on the CEPA, riparian rights and contract claims, and for Waterbury on the public and private nuisance claims. The court then entered an elaborate order for injunctive relief.[9]

---

[8] Waterbury asserted twelve special defenses to either some or all of the counts of the defendants' counterclaim. Those that are pertinent to this appeal will be discussed when addressing that issue.

[9] The trial court ordered the same injunctive relief for Waterbury's CEPA, contract and riparian rights violations. The ordered relief was as follows:

"1. The city of Waterbury, its agents, servants and employees, are hereby permanently enjoined from operating the city's water supply system and

from diverting water from the west branch of the Shepaug River through the aqueduct tunnel in a manner that results in a daily flow at Peter's Weir or other suitable location for a stream gauge above the confluence with the Bantam River of less than the following stream flow in the indicated months:

| | |
|---|---|
| May: | 34.3 mgd |
| June: | 13.8 mgd |
| July: | 7.6 mgd |
| August: | 6.5 mgd |
| September: | 6.1 mgd |
| October: | 9.8 mgd |

"2. Between the date of this order and the completion of alterations necessary to produce the flow rates specified above, the city shall operate the existing eight inch discharge pipe from the Shepaug dam at a maximum rate of discharge. Alterations to achieve the flow required at paragraph 1 shall be commenced expeditiously and shall be completed by May 1, 2002.

"3. The releases required by paragraphs 1 and/or 2 above may be reduced or suspended in the event of a declaration of a water supply emergency pursuant to [General Statutes] § 22a-378 or § 25-32b, only to the extent necessary to comply with any conditions imposed under the declaration issued under such statutory provisions.

"4. The city of Waterbury may temporarily reduce the releases required by paragraphs 1 and/or 2 above for the purpose and only during the time actually necessary to make safety repairs or modifications approved by the commissioner of environmental protection, including the modifications necessary to achieve the releases ordered above. Such reductions shall not be greater than is necessary to complete such projects.

"5. The city of Waterbury shall not divert water from the Shepaug watershed at any time when the Pitch Reservoir and also either the Morris Reservoir or the Wigwam Reservoir is full and either overflowing or discharging water through a pipe or by other means other than discharge to the water treatment plant of water to be supplied to customers for their water consumption needs.

"6. The city of Waterbury shall file the following with the appropriate regulatory authorities within ninety (90) days of the issuance of this order:

"A. All applications necessary to alter the Shepaug Dam and other structures to achieve the release rates and comply with the other orders set forth above;

"B. An application to revise its water supply plan to reflect revised methods of operation and revised drought triggers and other changes necessary to comply with the release rates and other orders set forth above.

"The city of Waterbury shall immediately upon filing supply each defendant with a copy of each application filed.

"7. The city of Waterbury shall make its best efforts to contract with the United States Geological Survey to install and monitor a stream gauge at a location at or downstream from Peter's Weir and upstream from the confluence of the Shepaug River with the Bantam River. If no such stream gauge

This appeal and cross appeal followed. Additional facts will be set forth as they pertain to the various claims.

## I

## THE CEPA CLAIM

Waterbury claims that the trial court improperly concluded that it violated CEPA by its operation of the Shepaug dam. Specifically, Waterbury asserts that the trial court: (1) lacked subject matter jurisdiction over the CEPA claim because the defendants had failed to exhaust their administrative remedies; (2) improperly declined to apply the minimum flow statute; General Statutes §§ 26-141a through 26-141c; when evaluating the CEPA claim; and (3) improperly concluded that Waterbury's conduct had resulted in an unreasonable impairment of the public trust under CEPA. We conclude that: (1) the defendants were not required to exhaust administrative remedies before bringing their CEPA claim in the trial court; (2) the trial court's finding of an unreasonable impairment is not consistent with the statutory scheme that the legislature has established in the area of watercourse management; and (3) the minimum flow statute governs the substantive analysis of whether Waterbury's conduct has resulted in the unreasonable impairment of the Shepaug River.[10]

has been installed by March 1, 2001, any of the defendants may arrange for the installation of such a stream gauge, and the city of Waterbury shall pay the costs associated with such installation and of monitoring of the gauge. Such stream gauge shall be of a kind sufficient to determine on an ongoing basis whether the flow of the Shepaug River is in compliance with the foregoing orders."

[10] Waterbury also contends that the remedy imposed by the trial court for its CEPA violation constituted a taking of its vested rights. More specifically, Waterbury argues that No. 252 of the 1893 Special Acts authorized Waterbury's present conduct, and the trial court's ordered remedy unconstitutionally infringes on Waterbury's rights. According to Waterbury, ordering it to discharge millions of gallons of water daily necessarily strips it of its legislatively granted rights. Because we are remanding the CEPA claim to the trial court with direction to impose no greater relief than would be

Waterbury sought this declaratory judgment that its operation of the Shepaug dam had "not unreasonably polluted, impaired or destroyed the public trust" in the water of the state under General Statutes § 22a-16[11] of CEPA. The defendants counterclaimed, asserting that Waterbury's excessive diversion of water from the Shepaug River unreasonably impaired the public trust in the water, thereby violating CEPA. Although the defendants did not claim that the existence of the dam itself constituted an unreasonable impairment, they took issue with the manner in which Waterbury operated its water supply system in the summer, specifically its diversion of water via the aqueduct tunnel into the Pitch Reservoir and its effect on the release of water to the Shepaug River.

To resolve the question of whether Waterbury's diversion of water from the Shepaug River violated CEPA, the trial court was required to determine whether Waterbury's diversion was of such magnitude that it

authorized by any applicable statute and accompanying regulation, and because Waterbury does not assert that its legally required compliance with the minimum flow statute, or other applicable statutes, constitutes a taking, we need not address this claim.

[11] General Statutes § 22a-16 provides: "The Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may maintain an action in the superior court for the judicial district wherein the defendant is located, resides or conducts business, except that where the state is the defendant, such action shall be brought in the judicial district of Hartford, for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity, acting alone, or in combination with others, for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction provided no such action shall be maintained against the state for pollution of real property acquired by the state under subsection (e) of section 22a-133m, where the spill or discharge which caused the pollution occurred prior to the acquisition of the property by the state."

constituted, not merely an impairment, but an unreasonable impairment of the public trust in the river as a natural resource in violation of § 22a-16. The trial court concluded that Waterbury's operation of the Shepaug dam constituted an impairment when "the summer flow of water in the river is reduced below its natural flow in the months of May through October." The trial court next found that "the defendants [had] made a prima facie case of unreasonable impairment of the public trust in the natural resources at issue, a flowing river," because the impairment was more than de minimis.

Waterbury offered several special defenses to Washington's CEPA claim, which, it argued, prevented the trial court from ordering any injunctive or declaratory relief pursuant to § 22a-16. Among such defenses were the claims that: (1) No. 252, § 1, of the 1893 Special Acts, which authorized Waterbury to "take and convey from any or all brooks, rivers, springs, ponds, lakes, and reservoirs within the limits of . . . the county of Litchfield, such supply of water as the necessities or convenience of the inhabitants of said city may require," and No. 252, § 3, which authorized Waterbury "in general, to do any other acts necessary or convenient for accomplishing the purposes contemplated by this act," vested certain rights in Waterbury to take water from the Shepaug River and that any retroactive application of CEPA would constitute a taking of those vested rights;[12] and (2) General Statutes § 22a-20[13] prevented

---

[12] See footnote 10 of this opinion.

[13] General Statutes § 22a-20 provides: "Sections 22a-14 to 22a-20, inclusive, shall be supplementary to existing administrative and regulatory procedures provided by law and in any action maintained under said sections, the court may remand the parties to such procedures. Nothing in this section shall prevent the granting of interim equitable relief where required and for so long as is necessary to protect the rights recognized herein. Any person entitled to maintain an action under said sections may intervene as a party in all such procedures. Nothing herein shall prevent the maintenance of an action, as provided in said sections, to protect the rights recognized herein, where existing administrative and regulatory procedures are found by the court to be inadequate for the protection of the rights. At the initiation of

the trial court from granting any relief because there were adequate administrative and regulatory procedures available to the defendants to protect their rights.[14] In support of this second special defense, Waterbury argued that the minimum flow statute established standards for minimum stream flow in stocked streams, which included the Shepaug River. Therefore, Waterbury contended, as long as it maintained flow in the Shepaug River in accordance with the minimum flow standards set forth by the department, it was, as a matter of law, in compliance with CEPA. Waterbury also argued that, if its diversion amounted to a violation of the minimum flow statute, the defendants could seek the relief afforded under § 26-141c, through the involvement of the department.

The trial court rejected these defenses and determined that Waterbury's current use of the Shepaug River constituted an "unreasonable impairment of the public trust in the natural resource at issue, a flowing river." On appeal, Waterbury reasserts the aforemen-

any person entitled to maintain an action under said sections, such procedures shall be reviewable in a court of competent jurisdiction to the extent necessary to protect the rights recognized herein. In any judicial review the court shall be bound by the provisions, standards and procedures of said sections and may order that additional evidence be taken with respect to the environmental issues involved."

[14] Waterbury also argued to the trial court that: (1) the 1921 contract with Washington, in which Waterbury promised to maintain a flow in the west branch of the Shepaug River of at least 1.5 mgd, constituted a waiver by Washington to any CEPA claim where the flow was above this level; (2) because Waterbury had properly registered its diversion of water from the Shepaug River under the Connecticut Water Diversion Policy Act (diversion act); General Statutes § 22a-365 et seq.; this diversion was exempt from any further scrutiny; (3) pursuant to General Statutes § 25-32 (a), the department of public health, which has jurisdiction over all water supply plans, has an opportunity to review the defendants' CEPA claim and thus provides an adequate administrative procedure under § 22a-20; (4) the statute of limitations on the CEPA claim had run; and (5) the defendants' claim is barred by the doctrine of laches. The trial court rejected these claims and Waterbury does not reassert them on appeal.

tioned defenses, challenges the trial court's determination of "unreasonable impairment," and, for the first time, challenges the jurisdiction of the trial court to adjudicate the CEPA claim. We address these claims separately.

## A
### Exhaustion of Administrative Remedies

We first address Waterbury's contention that the trial court lacked subject matter jurisdiction over the CEPA claim because the defendants failed to exhaust their administrative remedies. Specifically, Waterbury argues that the question of how much water it is required to release down the Shepaug River is governed by the minimum flow statutes, §§ 26-141a through 26-141c,[15]

---

[15] General Statutes § 26-141a provides: "Whenever any dam or other structure is maintained in this state which impounds, or diverts, the waters of a river or stream which is stocked with fish by the Commissioner of Environmental Protection, or which dam or other structure affects the flow of water in such a stocked river or stream, the commissioner may promulgate regulations setting forth standards concerning the flow of such water in accordance with section 26-141b."

General Statutes § 26-141b provides: "The Commissioner of Environmental Protection shall, on or before July 1, 1973, and after consultation and cooperation with the Department of Public Health, the Department of Public Utility Control and any other agency, board or commission of the state with which said commissioner shall deem it advisable to consult and after recognizing and providing for the needs and requirements of public health, flood control, industry, public utilities and water supply, and further recognizing and providing for stream and river ecology, the requirements of aquatic life, natural wildlife and public recreation, and after considering the natural flow of water into an impoundment or diversion, and being reasonably consistent therewith, and also after thirty days' notice in the Connecticut Law Journal and after thirty days' notice sent by certified mail to all persons, firms and corporations known to have a direct interest, hold a public hearing and, not earlier than thirty days thereafter, shall promulgate regulations establishing instantaneous minimum flow standards and regulations for all stocked river and stream systems. Such instantaneous minimum flow standards and regulations shall: (1) Apply to all river and stream systems within this state which the commissioner finds are reasonably necessary to keep a sufficient flow of water to protect and safely maintain the fish placed therein by him pursuant to his stocking program; (2) preserve and protect the natural aquatic life, including anadromous fish, contained within such

which charge the department with enforcement. General Statutes § 26-141b requires the department to "promulgate regulations establishing instantaneous minimum flow standards and regulations for all stocked river and stream systems." Section 26-141c empowers the department to enforce these standards. Waterbury also argues that only the department has jurisdiction to determine whether the minimum flow statute applies to the Shepaug River, rendering the trial court's consideration of the issue improper.

The defendants argue that, because Waterbury was the party that sought a declaratory judgment that it had not violated CEPA, thereby inviting the trial court to decide the issue, Waterbury should now be estopped from asserting this claim on appeal. The defendants also argue that it would be particularly inappropriate in this case to entertain Waterbury's jurisdictional claim, where the trial court "[a]t closing argument . . . invited the parties to comment on whether it ha[d] jurisdiction to decide all issues in the case." The only potential issues so identified for initial agency consider-

waters; (3) preserve and protect the natural and stocked wildlife dependent upon the flow of such water; (4) promote and protect the usage of such water for public recreation; (5) be consistent with the needs and requirements of public health, flood control, industry, public utilities, water supply, public safety, agriculture and other lawful uses of such waters."

General Statutes § 26-141c provides: "After the promulgation of the aforesaid minimum flow standards, no person, firm or corporation shall maintain any dam or structure impounding or diverting water within this state except in accordance with such standards and regulations as established by said commissioner. If the commissioner finds that any person, firm or corporation is violating such minimum flow standards, the commissioner shall issue an order to such person, firm or corporation to comply with his regulations. The order shall include a time schedule for the accomplishment of the necessary steps leading to compliance. If such person, firm or corporation fails thereafter to comply with the standards and regulations concerning minimum flow of water, the commissioner is empowered to request the Attorney General to bring an action in the Superior Court to enjoin such person, firm or corporation from restricting the flow of such water in accordance with such standards and regulations."

ation were two pending water supply applications by Wolcott and Middlebury for water from the Waterbury public water supply. For the reasons set out in the following discussion, we consider but reject Waterbury's claim that the trial court lacked subject matter jurisdiction to adjudicate the CEPA claim.

"We note at the onset that . . . a claim that this court lacks subject matter jurisdiction [may be raised] at any time. Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . The objection of want of [subject matter] jurisdiction may be made at any time . . . and the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . . If at any point, it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed." (Internal quotation marks omitted.) *Dowling* v. *Slotnik*, 244 Conn. 781, 787–88, 712 A.2d 396, cert. denied sub nom. *Slotnik* v. *Considine*, 525 U.S. 1017, 119 S. Ct. 542, 142 L. Ed. 2d 451 (1998). Although we previously have noted "that there are limits to the notion that subject matter jurisdictional defects may be raised at any time"; (internal quotation marks omitted) *Gangemi* v. *Zoning Board of Appeals*, 255 Conn. 143, 150, 763 A.2d 1011 (2001); see also *Vogel* v. *Vogel*, 178 Conn. 358, 362–63, 422 A.2d 271 (1979); those limits were invoked in cases involving collateral attacks on judgments that had been fully litigated, and which all parties had had the opportunity for appellate review. Although there may be instances in which a party who has invoked the jurisdiction of the court will not be permitted to claim later that the same court lacked jurisdiction, this is not that case, especially where two of the cases that Waterbury relies on for this claim,

namely, *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 1, 756 A.2d 262 (2000) (*Fish I*), and *Fish Unlimited* v. *Northeast Utilities Service Co.*, 254 Conn. 21, 755 A.2d 860 (2000) (*Fish II*), were decided after the trial court rendered its decision.[16] Therefore, despite Waterbury's invocation of the court's jurisdiction, we are constrained to address its contention that the trial court lacked subject matter jurisdiction over the parties' CEPA claim.

On the merits of the jurisdictional issue, Waterbury argues that our holdings in *Fish I*, *Fish II* and *Polymer Resources, Ltd.* v. *Keeney*, 227 Conn. 545, 561, 630 A.2d 1304 (1993), required the defendants first to exhaust all administrative remedies before bringing this action. Waterbury further asserts that the minimum flow statute applies to the Shepaug River, and therefore establishes the amount of water that Waterbury is required to release. Because the department is charged with enforcement of the minimum flow statute, Waterbury contends, the trial court had no jurisdiction over this claim. The defendants argue, to the contrary, that the minimum flow statute does not apply to the Shepaug River. Although Waterbury disagrees, it claims that even this fundamental question is one for the department, not the courts, to resolve. We disagree with Waterbury's claim, and conclude that CEPA, as particularly demonstrated by General Statutes § 22a-18,[17] does not embody

[16] Moreover, the cases relied upon by the defendants for the proposition that Waterbury should be estopped from arguing that the trial court lacks subject matter jurisdiction, after expressly inviting the court to hear the issue, namely, *Suffield Bank* v. *Berman*, 228 Conn. 766, 639 A.2d 1033 (1994), and *Draper* v. *Draper*, 40 Conn. App. 570, 672 A.2d 522 (1996), are inapposite because the claims in those cases did not implicate the subject matter jurisdiction of the court.

[17] General Statutes § 22a-18 provides: "(a) The court may grant temporary and permanent equitable relief, or may impose such conditions on the defendant as are required to protect the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction.

"(b) If administrative, licensing or other such proceedings are required

the exhaustion of administrative remedies doctrine. Therefore, the trial court did have subject matter jurisdiction to entertain the defendants' CEPA claim.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. . . . *McKart* v. *United States*, 395 U.S. 185, 193, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969). . . . *Johnson* v. *Statewide Grievance Committee*, 248 Conn. 87, 95, 726 A.2d 1154 (1999). Where a statutory requirement of exhaustion is not explicit, courts are guided by [legislative] intent in determining whether application of the doctrine would be consistent with the statu-

---

or available to determine the legality of the defendant's conduct, the court in its discretion may remand the parties to such proceedings. In so remanding the parties the court may grant temporary equitable relief where necessary for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction and the court shall retain jurisdiction of the action pending completion of administrative action for the purpose of determining whether adequate consideration by the agency has been given to the protection of the public trust in the air, water or other natural resources of the state from unreasonable pollution, impairment or destruction and whether the agency's decision is supported by competent material and substantial evidence on the whole record.

"(c) If the agency's consideration has not been adequate, and notwithstanding that the agency's decision is supported by competent material and substantial evidence on the whole record, the court shall adjudicate the impact of the defendant's conduct on the public trust in the air, water or other natural resources of the state in accordance with sections 22a-14 to 22a-20, inclusive.

"(d) Where, as to any administrative, licensing or other proceeding, judicial review thereof is available, the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review.

"(e) The court may award any person, partnership, corporation, association, organization or other legal entity which maintains an action under section 22a-16 or intervenes as a party in an action for judicial review under section 22a-19, and obtains declaratory or equitable relief against the defendant, its costs, including reasonable costs for witnesses, and a reasonable attorney's fee."

tory scheme. . . . Id., 96; accord *McCarthy* v. *Madigan*, 503 U.S. 140, 144, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992). Consequently, [t]he requirement of exhaustion may arise from explicit statutory language or from an administrative scheme providing for agency relief. . . . *Howell* v. *Immigration & Naturalization Service*, 72 F.3d 288, 291 (2d Cir. 1995). . . . *Johnson* v. *Statewide Grievance Committee*, supra, 97." (Internal quotation marks omitted.) *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 281, 788 A.2d 60 (2002).

Thus, the exhaustion doctrine is based on a judicial determination of a legislative intent that in certain cases the courts do not have initial subject matter jurisdiction because the legislature has committed the initial resolution of the matters in question to an administrative agency. Therefore, this doctrine does not apply when the legislature determines, by appropriate legislation, that a court *may* exercise subject matter jurisdiction despite the fact that there also may be administrative procedures available that would, absent such legislation, normally deprive the court of jurisdiction. The defendants argue that CEPA, particularly § 22a-18 (b), is such appropriate legislation. We agree.

Whether the legislature intended that the exhaustion doctrine apply to CEPA presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. *Frillici* v. *Westport*, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to

its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Bender* v. *Bender*, 258 Conn. 733, 741, 785 A.2d 197 (2001).

We begin our analysis with the text of the statute. Section 22a-18 (b) provides in relevant part: "If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, *the court in its discretion may remand* the parties to such proceedings. . . . [T]he court shall retain jurisdiction of the action pending completion of administrative action for the purpose of determining whether adequate consideration by the agency has been given . . . ." (Emphasis added.) The statutory language of § 22a-18 (b) strongly suggests that CEPA does not embody the exhaustion doctrine.

"We have consistently held that may is directory rather than mandatory. See, e.g., *Seals* v. *Hickey*, 186 Conn. 337, 345–47, 441 A.2d 604 (1982). The word may, unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion. See id., 345; *Ridgeway* v. *Ridgeway*, 180 Conn. 533, 540, 429 A.2d 801 (1980); see also *A. Dubreuil & Sons, Inc.* v. *Lisbon*, 215 Conn. 604, 611, 577 A.2d 709 (1990)." (Internal quotation marks omitted.) *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 252 Conn. 115, 122, 742 A.2d 1257 (2000). The legislature's use of the word "shall" elsewhere in § 22a-18 (b), and the use of both terms throughout CEPA, further support our interpretation. "The use of the word shall in conjunction with the word may confirms that the legislature acted with complete awareness of their different meanings; *Hartford Principals' & Supervisors' Assn.* v. *Shedd*, 202 Conn. 492, 506, 522 A.2d 264 (1987); and that it intended the terms to have different meanings. *Hinchliffe* v. *American*

*Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981) (use of different terms within same sentence of statute plainly implies different meanings intended), aff'd, 192 Conn. 252, 470 A.2d 1216 (1984); see also *Plourde* v. *Liburdi*, 207 Conn. 412, 416, 540 A.2d 1054 (1988)." (Internal quotation marks omitted.) *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, supra, 122.

Thus, the plain language of § 22a-18 gives the trial court discretion on whether to remand an action to an administrative agency that has within its jurisdiction, appropriate "administrative, licensing or other such proceedings . . . ." General Statutes § 22a-18 (b). Furthermore, as the defendants suggest, to conclude, as Waterbury urges, that the defendants must first turn to the department for a determination of whether the minimum flow statute applies, would render § 22a-18 a nullity. If a party were required to exhaust all administrative remedies before resorting to an independent action under CEPA, § 22a-18 (b) could never be invoked, because a trial court would never have had jurisdiction in the first place so as to be able to "remand the parties to [administrative, licensing or other] such proceedings." General Statutes § 22a-18 (b). We ordinarily do not read statutes so as to render parts of them superfluous; *Giaimo* v. *New Haven*, 257 Conn. 481, 493–94, 778 A.2d 33 (2001); and we see no compelling reason to do so with respect to § 22a-18.

An examination of the legislative history surrounding the enactment of CEPA further reinforces our conclusion that § 22a-18 was meant to trump the exhaustion doctrine. One of the overriding objectives of CEPA is to "enable persons to seek redress in the court when someone is [polluting] our environment." Conn. Joint Standing Committee Hearings, Environment, Pt. 1, 1971 Sess., p. 163, remarks of James Wade, counsel for the majority leadership in the House of Representatives. The bill was intended to "[expand] the right of a person

to have access to the courts when property which we might say belongs to all of the public is jeopardized by the alleged polluting activity. [Prior to the enactment of CEPA] a person, unless he [could] show a personal direct ownership or other interests in the land which he claim[ed] as being affected by the alleged activity [did] not have legal standing in the court of law. Consequently, some of the most beautiful aspects of our environment . . . do not lend themselves to a proprietary or a personal interest and [CEPA] makes the guaranteeing and the preservation and the protection of these rights [previously unavailable] available to the general public . . . ." 14 H.R. Proc., Pt. 2, 1971 Sess., p. 739, remarks of Representative John F. Papandrea. Moreover, in enacting CEPA, the legislature realized that it was "granting individual citizens some powerful weapons, the right to seek injunctions, the right to intervene in proceedings." 14 S. Proc., Pt. 3, 1971 Sess., p. 1083, remarks of Senator Thomas F. Dowd, Jr.

Although there was widespread support for permitting citizen suits concerning the environment, there was considerable debate over whether citizens must first exhaust all administrative remedies before being able to bring a separate action. When the environment committee held hearings on House Bill No. 5037, which, after several modifications, was passed as CEPA, the language of § 5 (1) through (4) was identical to what is now § 22a-18 (a) through (d). This concerned a number of groups who testified before the committee, and who therefore urged the legislature to modify the bill and require a citizen to turn first to the appropriate administrative agency for relief before bringing suit in the Superior Court.

Dale Van Winkle, of United Aircraft Corporation, testified that "we're not opposed to a citizen-enforcement; however, we would like to see this done in the way that it's done in other areas of law, and that is that the

administrative agencies are exhausted first. In most instances, you're not allowed to bring suit unless you have exhausted your administrative remed[ies]. . . . What I would prefer to have you do is to give the remedy only after the individual has gone to the Water Resources Commission or the Clean Air Commission . . . . [I]f they get no action out of the Commission, then let them bring their suit." Conn. Joint Standing Committee Hearings, supra, p. 177. This concern was reiterated by Henry Darius, on behalf of the Connecticut Light and Power Company and the Hartford Electric Light Company, who stated: "Our concern is that the administrative process be allowed to run its course. . . . We are inclined to believe that a better way to solve the problems that these bills seek to solve is to give whatever additional direction and powers to the agencies. . . . We further would agree with the comments made by Mr. Van Winkle about the exhaustion of administrati[ve] remedies. We feel that where an administrative agency has jurisdiction over a problem, that agency's powers should be allowed to be exercised without court interference, until such time as the agency's actions have been completed. Then they are properly reviewable by the courts." Id., pp. 204–205.

It was not solely business interests that urged the legislature to apply the exhaustion doctrine to CEPA claims. David B. Beizer, the executive director of Connecticut Action Now, stated that "the only good criticism that's been made of these bills, is that we should rely to the extent we can on the administrative process. I wholeheartedly agree, and I think with a minor change in wording, this criticism can be taken care of. In other words, where there is an administrative agency . . . that agency should be consulted first, and administrative action should be sought first, prior to the citizen going to court." Id., p. 216.

Despite these suggestions, when the House debated Substitute House Bill No. 5037, § 5 (b) still contained the permissive language: "If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, the court in its discretion *may* remand the parties to such proceedings." (Emphasis added.) It is clear from the debate on the bill that members of the House did not want to require citizens to exhaust their administrative remedies first. As Representative Papandrea made clear, "where administrative procedures are available the court, in its discretion can refer the case to the appropriate administrative agency for action, but once it does so, it will continue to retain jurisdiction over the case. So that if it is simply put to one side and forgotten, or not given the attention that it properly deserves, the plaintiff without incurring additional costs simply must bring this matter to the attention of the court and the court can then prod the agency and impose whatever orders it deems necessary to get the matter rolling." 14 H.R. Proc., supra, pp. 742–43.

Many representatives felt that the agencies were not policing the environment as aggressively as they should. Representative Francis J. Collins stated: "[T]his is a necessary bill because it may well prod many of our state agencies charged with the protection of the environment . . . into more thorough and responsive carrying out of the legislative programs." Id., p. 745. They viewed this bill as intending to permit "an individual or a group to seek redress without waiting to go through the water resources commission[18] or some other commission or board with its necessary delays and staggering along on the complaint." Id., pp. 746–47, remarks of Representative Howard A. Newman. Although there was some support for the idea to attempt "to strengthen

---

[18] The water resources commission became part of the department when it was created in 1971.

those environmental and ecology agencies that we have, give them the power to move in where there is a complaint and if they feel that the complaint is justified, let them take action"; id., p.764, remarks of Representative Robert D. King; there was no attempt to amend the bill for that purpose.

When the bill reached the Senate, however, Senator Dowd offered Senate Amendment Schedule A, which would have substituted the word "shall" for "may" in what is now General Statutes §§ 22a-18 (b) and 22a-20.[19] See 14 S. Proc., supra, p. 1083. As Senator Dowd explained, "before we grant [citizens the right to seek injunctions and intervene in proceedings], which could result in dragging business into court with the exposure to costly time consuming litigations . . . [i]s it not reasonable to require the individuals to at least first exhaust the administrative procedures which we ourselves in this General Assembly have set up? . . . If, after exploring the administrative procedures he's still unsatisfied, there's nothing in this amendment to my mind, that would prevent his exercising his full rights which we will be granting under this bill." Id.

---

[19] General Statutes § 22a-20 provides: "Sections 22a-14 to 22a-20, inclusive, shall be supplementary to existing administrative and regulatory procedures provided by law and in any action maintained under said sections, the court may remand the parties to such procedures. Nothing in this section shall prevent the granting of interim equitable relief where required and for so long as is necessary to protect the rights recognized herein. Any person entitled to maintain an action under said sections may intervene as a party in all such procedures. Nothing herein shall prevent the maintenance of an action, as provided in said sections, to protect the rights recognized herein, where existing administrative and regulatory procedures are found by the court to be inadequate for the protection of the rights. At the initiation of any person entitled to maintain an action under said sections, such procedures shall be reviewable in a court of competent jurisdiction to the extent necessary to protect the rights recognized herein. In any judicial review the court shall be bound by the provisions, standards and procedures of said sections and may order that additional evidence be taken with respect to the environmental issues involved."

Several senators opposed the amendment, however, fearing that "if this amendment were passed, it would effectively emasculate this legislation. . . . So often these matters do drag through administrative processes and no action was taken and the citizens [need] and [are] entitled in this bill, some direction. Direct action." Id., p. 1084, remarks of Senator Roger W. Eddy. "[O]ne of the problems that we're having right now is, the fact that the administrative process [takes] so long that I certainly don't want to give any grounds for them to be dumped back into that merry go round, that we have been having over the past four years." Id., p. 1085, remarks of Senator George L. Gunther. "[M]y reading of it to changing of this one word, would change this statute from a statute whereby the public can sue to a statute whereby it would be in essence, simply a statute which grants an appeal, from the action of the administrative agencies. This is certainly not the intent of the full statute." Id., remarks of Senator James W. Macauley, Jr. This amendment was then defeated.

Thus, given the plain language of § 22a-18 and the legislative history of CEPA, the conclusion is inescapable that CEPA does not embody the exhaustion doctrine as a subject matter jurisdictional limit on the court's entertainment of an action under it. The language is discretionary. The committee reported the bill out with that language unchanged. The legislative history evinces an intent not to incorporate the exhaustion doctrine. A specific attempt in the Senate to amend it by inserting the exhaustion doctrine was defeated. Therefore, we conclude that, on the facts of this case, the defendants were not required to exhaust their administrative remedies, and that the trial court had subject matter jurisdiction over the defendants' CEPA claims.

Despite the language of § 22a-18 and its accompanying legislative history, Waterbury, implicating the

doctrine of stare decisis, contends that our prior case law requires the defendants to proceed first to the department for, at the very least, a determination of whether the minimum flow statute applies. "[T]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *Rivera* v. *Commissioner of Correction*, 254 Conn. 214, 251, 756 A.2d 1264 (2000). "In assessing the force of stare decisis, our case law has emphasized that we should be especially cautious about overturning a case that concerns statutory construction." *Conway* v. *Wilton*, 238 Conn. 653, 681, 680 A.2d 242 (1996) (*Peters, C. J.,* dissenting). Despite this reluctance, however, we have, on occasion, overruled cases that have involved the interpretation of a statute. See, e.g., *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 196, 708 A.2d 1371 (1998) (overruling prior interpretation of General Statutes § 37-9 [3] because it created conflict between civil and criminal provisions of usury law); *Santopietro* v. *New Haven*, 239 Conn. 207, 215, 682 A.2d 106 (1996) (concluding that previous statutory analysis of General Statutes § 52-228b was flawed); *Conway* v. *Wilton*, supra, 681 (overruling prior interpretation of General Statutes § 52-557f [3] as applied to municipalities). Thus the fact that there is preexisting case law on point is not, in and of itself, determinative of the issue presently before us.

We acknowledge that Waterbury's position is similar to that of the defendants in *Middletown* v. *Hartford Electric Light Co.*, 192 Conn. 591, 473 A.2d 787 (1984), and *Fish II*, supra, 254 Conn. 21, two cases relied upon by Waterbury in advancing the argument that the proper forum for resolution of the CEPA issue was in the first instance, the department. In *Middletown* v. *Hartford Electric Light Co.*, supra, 597, and *Fish II*, supra, 31, we concluded that, pursuant to the doctrine of exhaus-

tion of administrative remedies, the defendants were required to bring their claims to the administrative bodies entrusted with enforcement of the environmental statutes on which their claims were based. In neither of these cases, however, did the parties rely on or draw our attention to the language of § 22a-18 and its effect on our interpretation of General Statutes §§ 22a-16[20] and 22a-19.[21] The language of § 22a-18, coupled with the purpose of CEPA, compels us to overrule our prior cases concerning the exhaustion doctrine as applied to CEPA.

Although this court has never directly addressed the relationship between the exhaustion doctrine and § 22a-18, we have addressed it in conjunction with §§ 22a-16 and 22a-19. These two sections provide citizens with several avenues with which to seek judicial redress. Section 22a-16 governs independent court actions under CEPA, and § 22a-19 governs interventions into certain proceedings in order to assert CEPA environmental claims. Pursuant to § 22a-16, the "Attorney General . . . any person, partnership, corporation, association,

---

[20] See footnote 11 of this opinion.

[21] General Statutes § 22a-19 provides: "(a) In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state.

"(b) In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare."

organization or other legal entity may maintain an action in the superior court . . . for declaratory and equitable relief against the state, any political subdivision thereof, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity . . . for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . . ." Section 22a-19 (a) permits these same parties, "[i]n any administrative, licensing or other proceeding, and in any judicial review thereof made available by law . . . [to] intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

We previously have addressed the reach of these two provisions in *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 470 A.2d 1214 (1984), and *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 591. In *Connecticut Fund for the Environment, Inc.* v. *Stamford*, supra, 248, one of the plaintiffs, the Better Neighborhood Association of Stamford (association), intervened in an administrative proceeding conducted by the Stamford inland wetland agency, denominated as the environmental protection board (board), pursuant to § 22a-19 (a), in which the board was reviewing an application for the development of a large tract of land to be used as a postal facility. After the board approved the project, the association appealed on the ground that the board had excluded certain environmental evidence, even though the evidence was not related to inland wetlands, which was all that the board was charged with addressing. Id., 249–50. In affirming

the dismissal of the association's appeal, this court held: "Section 22a-19 is not intended to expand the jurisdictional authority of an administrative body whenever an *intervenor* raises environmental issues. Thus, an inland wetland agency is limited to considering only environmental matters which impact on inland wetlands. Other environmental impacts *must be raised* before other appropriate administrative bodies, if any, *or in their absence* by the institution of an independent action pursuant to § 22a-16." (Emphasis added.) Id., 250–51.

We then addressed the reach of § 22a-16 in *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 591. In that case, the plaintiffs brought an action in the Superior Court to enjoin the defendants from burning PCB contaminated mineral oil at the defendants' generating plant. Id., 592–93. The trial court dismissed the four counts of the complaint that alleged that the defendants had failed to obtain various permits needed to dispose of PCBs, on the ground that the plaintiffs lacked standing. Id., 595. On appeal, the plaintiffs contended that § 22a-16 gave them standing to bring an action to protect the environment from the damage that the PCB disposal could cause; id., 596–97; because § 22a-16 allowed "any person . . . [to] maintain an action in the superior court . . . for the protection of the public trust in the air . . . from unreasonable pollution . . . ."

We affirmed the trial court's dismissal of the plaintiffs' action. In applying our reasoning under § 22a-19, set out in *Connecticut Fund for the Environment, Inc.*, we reaffirmed "that invocation of [CEPA] is not an open sesame for standing to raise environmental claims with regard to any and all environmental legislation. . . . These same principles [as enunciated in *Connecticut Fund for the Environment, Inc.*] apply to bar the city's standing under the licensing statutes. The trial court was therefore correct in concluding that § 22a-16 did

not provide the plaintiffs with standing under any statute other than [CEPA] itself."[22] (Citations omitted.) *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 597. As a result of this decision, the plaintiffs in that case would be required to go to each administrative agency charged with issuing the necessary permits and seek redress there.[23]

In *Polymer Resources, Ltd.* v. *Keeney*, supra, 227 Conn. 545, we returned to the issue of standing, although not in the context of CEPA. In *Polymer Resources, Ltd.*, the commissioner of the department had issued an ex parte cease and desist order under General Statutes § 22a-7 against the plaintiff ordering it to cease various manufacturing processes until proper corrective action was taken. Id., 549. The plaintiff,

---

[22] In *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 600, although this court rejected, for lack of standing, the plaintiffs' § 22a-16 claims involving the defendants' failure to obtain several statutorily mandated permits, we concluded that the plaintiffs *did* have standing to bring the claim that "burning of PCB contaminated mineral oil constituted a violation of [CEPA] . . . ." The claim subsequently was rejected, on its merits, on factual insufficiency grounds. Id., 601.

[23] For example, the plaintiffs had claimed that the defendants were required to obtain a PCB disposal permit under General Statutes § 22a-467, which provides in relevant part: "No person shall dispose of the compound PCB or any item, product or material containing the compound PCB except in accordance with a permit issued pursuant to section 22a-208a, 22a-430 or 22a-454. . . ." These three sections lay out detailed requirements and procedures for obtaining permits. General Statutes § 22a-469 provides that "[a]ny person who or municipality which violates any provisions of sections 22a-463 to 22a-469, inclusive, shall be subject to the penalties provided for in section 22a-438." General Statutes § 22a-438 provides in relevant part: "(a) Any person who or municipality which violates any provision of this chapter, *or* section 22a-6 or 22a-7 shall be assessed a civil penalty not to exceed twenty-five thousand dollars . . . ." (Emphasis added.) General Statutes § 22a-6 (a) (3) permits the commissioner of the department to "initiate and receive complaints as to any actual or suspected violation of any statute, regulation, permit or order administered, adopted or issued by him. . . ." Thus, in the above example, if the plaintiffs believed that the defendants had failed to comply with the requirements of § 22a-467, they would have been required to bring a complaint before the department and give it the opportunity to resolve such a claim.

although initially agreeing to be bound by the terms of the order, later sought an ex parte restraining order in the Superior Court against the department, preventing it from further interfering in the plaintiff's operation. Id., 555–57. We held that the trial court did not have jurisdiction to entertain the plaintiff's application for a temporary injunction against the department because the plaintiff had not first exhausted its administrative remedies by seeking "a declaratory ruling by the commissioner pursuant to General Statutes § 4-176 (a)" that portions of the department's mandated remedies were improper. Id., 556. If the plaintiff were aggrieved by that decision, we noted, it could then appeal to the Superior Court pursuant to General Statutes § 4-183. Id., 558. We stated: "It is a settled principle of administrative law that, if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter. . . . When a particular statute authorizes an administrative agency to act in a particular situation it necessarily confers upon such agency authority to determine whether the situation is such as to authorize the agency to act— that is, to determine the coverage of the statute—and this question need not, and in fact cannot, be initially decided by a court." (Citations omitted; internal quotation marks omitted.) Id., 557–58.

We applied the reasoning of *Polymer Resources, Ltd.*, to a claim brought under CEPA in *Fish I*, supra, 254 Conn. 7, where the plaintiffs, in addition to intervening in the defendants' permit renewal proceedings before the department, brought an action in the Superior Court under § 22a-19. Although recognizing the exhaustion doctrine, the plaintiffs contended that "they [were] excused from compliance because the injunctive relief they [sought] was not available through the administrative process." Id., 14. Specifically, they argued that resorting "to the administrative remedies would have

been futile and inadequate." Id., 11. We rejected the plaintiffs' contention that the available administrative remedies would have been futile or inadequate, and ordered the dismissal of the plaintiffs' complaint on the ground that "the plaintiffs failed to exhaust their administrative remedies . . . ." Id. We reasoned that, because the permitting process was still in progress, "by failing to exhaust their administrative remedies, the plaintiffs . . . deprived the department of the opportunity to review a matter within its responsibility and expertise." Id., 20–21.

Argued at the same time was *Fish II*, supra, 254 Conn. 28, wherein we rejected the plaintiffs' argument that, despite their failure to exhaust administrative remedies, they could maintain a separate action under § 22a-16. Although we recognized that "§ 22a-16 abrogates the aggrievement requirement for bringing an action directly in the Superior Court, our case law explains the limitations of § 22a-16, and elaborates why the plaintiffs must pursue their claim by intervening in an administrative hearing before the department pursuant to § 22a-19." Id., 31. We declined to allow the plaintiffs to "use § 22a-16 as an 'open sesame' to litigate environmental issues that are governed by [General Statutes] § 22a-430, and which clearly have been placed within the exclusive domain of the department"; id., 34; and thus held that the plaintiffs lacked standing under § 22a-16 to bring their action.[24] Id.

Waterbury argues that the defendants' entire complaint is premised on the lack of flow in the Shepaug

[24] Unlike in *Fish II*, however, in *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 600, we permitted a claim under § 22a-16 that burning of PCBs violated CEPA. See footnote 22 of this opinion. Although we did not elaborate on our reasons for upholding the plaintiffs' standing on this count, it is likely that, unlike in *Fish II*, there was no "appropriate administrative body"; id., 597; before which to bring this claim. In *Fish II*, supra, 254 Conn. 33, the permitting claims raised by the plaintiffs were governed by § 22a-430.

River due to Waterbury's diversion. It contends that the rate of flow is governed by the minimum flow statute, which is enforced by the department, and therefore, like the plaintiffs in *Middletown* and *Fish II*, who were not allowed to bring independent actions under CEPA when an appropriate administrative body was available, so should the defendants in the present case be precluded from bringing this action, until the department addresses the minimum flow issue.

As we have explained previously, a proper reading of § 22a-18 precludes the application of the exhaustion doctrine. To continue to apply it to an action brought pursuant to § 22a-16 would be to defy both the language and purpose of § 22a-18. Moreover, in neither *Middletown, Fish I* nor *Fish II*, were we apprised of the interplay among § 22a-18 and §§ 22a-16 and 22a-19. Now that this argument is before us, however, we cannot continue to apply the exhaustion doctrine to claims brought under CEPA. To the extent that this holding conflicts with our previous decisions applying the exhaustion doctrine to an independent action under § 22a-16, namely, *Middletown, Fish I* and *Fish II*, we overrule them.[25]

Our rejection of the applicability of the exhaustion doctrine to CEPA actions brought pursuant to § 22a-16 does not mean, however, that a court having subject matter jurisdiction of such an action is therefore free to disregard any relevant and appropriate administrative

---

[25] Recently, in *Nizzardo* v. *State Traffic Commission*, 259 Conn. 131, 148, 788 A.2d 1158 (2002), this court reaffirmed the holdings of *Connecticut Fund for the Environment, Inc.* v. *Stamford*, supra, 192 Conn. 247, and *Middletown* v. *Hartford Electric Light Co.*, supra, 192 Conn. 591. In *Nizzardo* v. *State Traffic Commission*, supra, 148, however, we held that § 22a-19 permitted *intervention* in an administrative proceeding only to the extent that the particular environmental concerns are within the subject matter jurisdiction of the administrative agency. This case, and thus our reasoning regarding the exhaustion doctrine, does not involve an intervention under CEPA.

scheme. As we explain more fully in the discussion that follows, under the related doctrine of *primary jurisdiction*, which is embodied by § 22a-18 of CEPA, the court has discretion, and in certain cases should refer the case, or certain aspects of it, to the administrative agency, yet retain jurisdiction for further action, if appropriate, under that section.

B

The Minimum Flow Statute

Having determined that the trial court had jurisdiction to entertain Waterbury's declaratory judgment action and the defendants' counterclaims concerning a potential violation of CEPA, we turn now to the merits of Waterbury's appeal. Waterbury claims that the trial court improperly concluded that the operation of the Shepaug dam resulted in an unreasonable impairment of flow in the Shepaug River under CEPA by: (1) applying an improper legal standard in determining whether there was an impairment; and (2) applying an incorrect legal standard in determining whether the impairment was unreasonable, by failing to evaluate the CEPA claim in terms of the minimum flow statute. We conclude that: (1) the trial court applied the appropriate legal standard in its determination that the Shepaug River was impaired; and (2) it applied an improper legal standard in determining whether the impairment was unreasonable, because under the circumstances of this case, the Shepaug River is a watercourse that is subject to the minimum flow statute, and that statute gives substantive content to the determination of whether the impairment was unreasonable.

Before addressing these issues, we briefly set forth the standard by which we review the trial court's actions. The meaning of the words impairment and unreasonable impairment, for purposes of CEPA, pre-

sents a question of statutory interpretation, over which our review is plenary. *State* v. *Ehlers*, 252 Conn. 579, 589, 750 A.2d 1079 (2000).

## 1

### Impairment

The trial court, after noting that CEPA does not define the term "impairment," observed that "the erection of a dam across a river alters that river." The trial court concluded that, under CEPA, the Shepaug River was impaired during the months of May through October[26] because the actual flow of water down the Shepaug River, as measured by one of Waterbury's experts, was less than what the median natural flow of water would have been had the Shepaug dam never been built.[27] We agree with the trial court's reasoning, and conclude that a dammed watercourse will be considered impaired, for purposes of CEPA, whenever the flow down that watercourse is less than what the natural flow would have been in the absence of the dam.

[26] The defendants claimed an impairment of flow only during the summer months.

[27] To determine the natural flow of water down the Shepaug River, the parties presented various models of watershed productivity, all of which, as the trial court described, involved "taking measurements of flow from long-duration stream gauges at roughly similar rivers in the same general area, then performing mathematical analyses to estimate the flow of the upper portion of the west branch of the Shepaug, making adjustments to reflect differences in the size of the watershed and other factors. . . . The favored methodology is to perform the analysis using a gauged stream that is as closely similar, with regard to rainfall, climate, geology, and terrain, as possible to the stream for which a flow rate is being modeled. In choosing a surrogate river from which to model, it is a good practice to consider whether the gauged stream is itself affected by dams and diversions which distort its natural flow." The method selected by the trial court is known as watershed ratio transform. Although we affirm the trial court's conclusion that the Shepaug River was impaired for purposes of CEPA, we do not suggest that trial courts *must* employ the watershed ratio transform method as the only method by which to determine the natural flow of a watercourse.

First, the use of the word "impairment," as applied in the context of a watercourse, suggests some diminution of the natural flow of the watercourse. Furthermore, that linguistic suggestion is consistent with the general legislative scheme of regulation of watercourses. By enacting other statutes regulating the minimum flow of water in stocked watercourses and creating a permitting scheme for water diversions; see General Statutes §§ 26-141a through 26-141c; General Statutes § 22a-365 et seq.; the legislature has implicitly acknowledged that any diminution of natural flow has environmental consequences. The legislature chose, however, to tolerate a diminution in natural flow under certain conditions, as we discuss in part I B 2 of this opinion. It is reasonable, therefore, to conclude that the meaning of the concept of impairment of a watercourse should be judged in relation to its natural flow rate.[28] Additionally, as will become evident, this definition is consistent with this court's interpretation of the term "unreasonable impairment," as used in CEPA. See General Statutes §§ 22a-15 through 22a-19. Thus, we conclude that the trial court properly determined that the construction of the dam impaired the Shepaug River, within the meaning of CEPA.

2

Unreasonable Impairment

We next determine whether the impairment is unreasonable. The defendants argue that the trial court, rely-

---

[28] Thus, we reject Waterbury's invitation to adopt a four part test created by the Michigan Court of Appeals in *Portage* v. *Kalamazoo County Road Commissioner*, 136 Mich. App. 276, 282, 355 N.W.2d 913 (1984), appeal denied, 422 Mich. 883 (1985), to determine whether the Shepaug River is impaired. The four *Portage* factors are: "(1) whether the natural resource involved is rare, unique, endangered or has historical significance; (2) whether the resource is easily replaceable (for example, by replanting trees or restocking fish); (3) whether the proposed action will have significant consequential effect on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed); and (4) whether the direct or consequential impact on animals or vegetation will affect a critical

ing on certain language in *Manchester Environmental Coalition* v. *Stockton,* 184 Conn. 51, 57–60, 441 A.2d 68 (1981), properly concluded that any impairment that was more than de minimis, or not "so negligible that [it] would be asserted only for reasons of spite or for harassment," constituted an unreasonable impairment. The trial court then concluded: "The impairment of the river's flow identified by the defendants is not so minor that invoking it can only proceed from spite or a desire to harass . . . . [T]he defendants have made a prima facie case of unreasonable impairment of the public trust in the natural resource at issue, a flowing river."

Waterbury argues that *Manchester Environmental Coalition* addressed only the issue of unreasonable pollution, not unreasonable impairment, and that our decision in *Fish II* requires us to make an unreasonableness inquiry with reference to the substantive law of the case, here, the minimum flow laws. We agree with Waterbury, albeit for different reasons, and we conclude that the trial court's interpretation of *Manchester Environmental Coalition* as standing for the proposition that the *only* meaning of the term "unreasonable impairment" is something more than de minimis was improper. On the facts of the present case, the term "unreasonable impairment" must be evaluated through the lens of the entire statutory scheme, if any, that the legislature has created to regulate the conduct underlying the impairment.

What constitutes an unreasonable impairment for purposes of deciding whether a violation of CEPA has occurred in the Shepaug River is a question of statutory construction. As previously stated, the term "impairment" is undefined in CEPA, as are the express circum-

---

number, considering the nature and location of the wildlife affected." Id. We simply see no support in either the language or purpose of CEPA for such a complicated meaning of the term "impair."

stances in which such impairment may be termed "unreasonable." The other provisions of CEPA, however, aid in the ascertainment of the meaning of the term "unreasonable impairment." General Statutes § 22a-17[29] sets the hurdles one must overcome in order to satisfy the burden of proof requirements set under CEPA. Pursuant to § 22a-17, "[a]lthough the ultimate burden of proof never shifts from the plaintiff, [CEPA] contemplates a shifting of the burden of production. See *Ray* v. *Mason County Drain Commissioner*, 393 Mich. 294, 311, 224 N.W.2d 883 (1975). The plaintiff must first make a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely *unreasonably* to pollute, *impair*, or destroy the public trust in the air, water or other natural resources of the state . . . ." (Emphasis added; internal quotation marks omitted.) *Manchester Environmental Coalition* v. *Stockton*, supra, 184 Conn. 57–58. "Once a prima facie case is shown, the burden of production shifts to the defendant. Under § 22a-17, the defendant may rebut the prima facie showing by the submission of evidence to the contrary." (Internal quo-

---

[29] General Statutes § 22a-17 provides: "(a) When the plaintiff in any such action has made a prima facie showing that the conduct of the defendant, acting alone, or in combination with others, has, or is reasonably likely unreasonably to pollute, impair or destroy the public trust in the air, water or other natural resources of the state, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare. Except as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principles of burden of proof and weight of the evidence generally applicable in civil actions.

"(b) The court before which such action is brought may appoint a master or referee, who shall be a disinterested person and technically qualified, to take testimony and make a report to the court in the action. The costs of such appointment may be apportioned to the parties if the interests of justice require."

tation marks omitted.) Id., 60. In addition to submitting contrary evidence, § 22a-17 (a) permits a defendant to "prove, by way of an *affirmative defense*, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare." (Emphasis added.)

For us to conclude, as the trial court did in this case, that unreasonable means *only* some level more than de minimis, the *only* evidence a defendant would be able to offer to rebut a prima facie case would be evidence that there was *no* pollution, impairment, or destruction of the natural resource. Thus, in many circumstances, particularly when dealing with a dammed watercourse where some level of impairment is practically assured, the defendant's only defense would be the separate affirmative defense that, "considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare." General Statutes § 22a-17 (a).

An examination of the legislative history of CEPA, however, reveals that § 22a-17 was not meant to relegate a defendant to disproving a CEPA violation solely by resorting to this affirmative defense. Representative Papandrea, when explaining the burden shifting mechanism of CEPA, stated: "Once having brought the law suit, the plaintiff, the person who brings the law suit, [has] the burden of proving not just the fact that pollution has, or is about to occur. He must prove that the pollution complain[ed] of is unreasonable and unavoidable. . . . Since unreasonableness is a matter of fact to be determined by the judge after listening to both sides and all of the evidence which they have to present, there is no question that the judge will have access to

all of the merits, to all of the implications, to all of the potential problems before he is called upon to make a decision." 14 H.R. Proc., supra, pp.741–42. This suggests that the legislature intended that a court would be called upon to consider much more than whether a party has brought a suit simply for purposes of spite or harassment or whether the conduct complained of was merely more than de minimis. If a court were, in fact, so limited in its determination of unreasonableness, the need for this level of evidentiary review would be obviated.

The argument that unreasonable means anything more than de minimis is further undercut by the legislators' belief that CEPA would not unduly interfere with business operations. When some legislators expressed concern that CEPA could prevent a farmer from spraying his crop with pesticides, Representative John G. Matthews commented: "[T]he Bill in my estimation would not prohibit him from using a spray, he has the right to earn his living in his profession or occupation, and certainly unless he sprays indiscriminately all over and destroys things well beyond his own property line, there is certainly no restriction on it." Id., p. 750. This comment was echoed by Representative Papandrea when he stated: "[T]his [bill] does not in any way expand the present common law right of any individual in the state of Connecticut to bring a lawsuit in nuisance against anyone who is directly damaging him or his property by way of pollution. . . . [T]here is already in this state an action at law available to an abutting property owner." Id., pp. 738–39. Moreover, some legislators expressed concern that CEPA could be used as a mechanism to drive away businesses. In fact, at least in the eyes of one legislator, "[t]he Bill has been presented by the majority leadership as being so protective to the business community, to the farmer, as to make the Bill [innocuous]. The protective measures are such that we are lead to believe that technically no action

would be taken under it. . . . If it is not correct, and
if there will be and can be under the Bill . . . harass-
ment, suits, self seeking publicity suits, then the Bill is
a bad one particularly bad at this time, where Connecti-
cut is having financial and economic difficulties, it
needs business, it needs jobs." Id., p. 752, remarks of
Representative Abijah U. Fox. Yet, if any level of pollu-
tion, impairment, or destruction above what would be
considered de minimis were sufficient to establish a
prima facie violation of CEPA, then there would seem
to be nothing to prevent such suits against groups such
as farmers, where the neighboring land belongs to the
public trust. It is clear that the legislature did not intend
for a plaintiff to be able to establish a prima facie case
under CEPA on the sole basis that the defendant's con-
duct was causing something more than a de minimis
impairment.

Despite this statutory text and legislative history, the
defendants urge us to reaffirm our conclusion in *Man-
chester Environmental Coalition* v. *Stockton,* supra,
184 Conn. 58, that the "word 'unreasonabl[e]' [in the
context of pollution][30] was added as a means of pre-
venting lawsuits directed solely for harassment pur-
poses." In that case, we stated that "[t]he defendants
argue that the word unreasonable was intended to per-
mit the balancing of major state policies and competing
interests. The clear legislative history shows that this
was not the intent. . . . The trial court found that the
plaintiffs were not solely motivated by harassment pur-
poses." (Citation omitted; internal quotation marks

---

[30] Although Waterbury argues that *Manchester Environmental Coalition*
only defined the term "unreasonable" with regard to pollution, and not
impairment, the language of the statute strongly suggests that the term
"unreasonable" was intended to modify not only the word "pollute," but
also the words "impair" and "destroy" as well. Furthermore, there is no
indication in the text, or from the legislative history, that the term "unreason-
able" was intended to have a different meaning when applied to pollution
from its meaning when applied to impairment of a natural resource.

omitted.) Id., 58–59 n.10. Therefore, we concluded, "the plaintiffs presented a prima facie case by showing a protectible natural resource (air) and that the action of the defendants would impair this resource." Id., 58.

We reached this conclusion based solely on the comments of Attorney Wade. While discussing the differences between House Bill No. 5037, which included the word "unreasonably" and was enacted into law, and Senate Bill No. 400, which did not contain the word "unreasonably," Wade stated: "Now in framing this legislation, it was our judgment that all of us pollute the environment to one degree or another, simply by breathing, obviously we introduce elements into the environment which are not natural. And therefore, if we are going to permit the use of the courts by citizens to bring law suits against those who do pollute the environment, we believe there must be a check to prevent those suits which are brought simply for harassment, and for no other purpose. Therefore, [House Bill No.] 5037, which Speaker [William R.] Ratchford has introduced, permits law suits against those who unreasonably pollute the environment. . . . [I]f [Senate Bill No.] 400 were passed with no check, then you might wind up with spite suits between neighbors and that sort of thing over conditions that are nothing more than spite between neighbors. We feel our bill, which imposes the reasonable standard, would be such as to eliminate that possibility." Conn. Joint Standing Committee Hearings, supra, p. 162.

Although, taken in isolation, these comments may suggest that the term "unreasonable" meant only any impairment more than de minimis, Wade's next comments contradict that meaning. Immediately after Wade made his comments explaining the insertion of the word "unreasonable" into House Bill No. 5037, he stated: "I recognize the fact that *a person or company or corporation could be polluting the environment, and his pollu-*

*tion alone is not unreasonable.* But when his pollution is introduced into the environment in combination with others, it does become unreasonable, and the best example might be if someone is pouring filth or pollution into the Connecticut River. A large body of water, which standing alone would not be unreasonable, but when you combine it with everybody upstream, his little bit add[ed] thereto, makes it unreasonable."[31] (Emphasis added.) Id., pp. 162–63.

If the term "unreasonable" meant only anything more than de minimis, the act of dumping any filth or pollution into a watercourse necessarily would be unreasonable. It could not be contended that the suit was being brought solely for harassment purposes, and unless we were to subscribe to the notion that it would be permissible to dump pollution in small quantities and let the water dilute it, this polluting activity would likely cause more than a de minimis effect on the watercourse. Thus, if one can "pollut[e] the environment, and [that] pollution alone is not unreasonable"; id., p. 162; then the word "unreasonable" must have some meaning other than anything more than de minimis.

Even *Manchester Environmental Coalition* itself, despite its language to the contrary, envisioned a scheme in which a prima facie case consisted of more than the mere production of evidence illustrating something more than de minimis pollution, impairment or damage. In that case we stated: "Once a prima facie case is shown, the burden of production shifts to the defendant. Under § 22a-17, 'the defendant may rebut

---

[31] Following this statement, Wade also recommended that the phrase "acting alone or in combination with others" be added to what is now §§ 22a-16 and 22a-17 to overcome "the problem of the fact that someone, acting alone does not *pollute unreasonably,* but acting with others does." (Emphasis added.) Conn. Joint Standing Committee Hearings, supra, p. 163. This further reinforces the notion that the legislature did not think of unreasonable pollution as being simply a quantity more than de minimis.

the prima facie showing by the submission of evidence to the contrary.' As stated in *Ray* v. *Mason County Drain Commissioner*, supra, [393 Mich.] 311–12, '[t]he nature of the evidence necessary to rebut [the] plaintiff's showing will vary with the type of environmental pollution, impairment or destruction alleged and with the nature and amount of the evidence proffered by the plaintiff. In some cases, no doubt, testimony by expert witnesses may be sufficient to rebut [the] plaintiff's prima facie showing. While in other actions the defendant may find it necessary to bring forward field studies, actual tests, and analyses which support his contention that the environment has not or will not be polluted, impaired or destroyed by his conduct. Such proofs become necessary when the impact upon the environment resulting from the defendants' conduct cannot be ascertained with any degree of reasonable certainty absent empirical studies or tests.' " *Manchester Environmental Coalition* v. *Stockton*, supra, 184 Conn. 60. If the only way to rebut a prima facie case were to offer evidence that the pollution, impairment or destruction, if it existed at all, was de minimis, then the quantity and quality of rebuttal evidence envisioned by this court in *Manchester Environmental Coalition* would be excessive and unnecessary. Rather, the previous quote, taken from *Ray* v. *Mason County Drain Commissioner*, supra, 294, envisions a scenario in which the rebutting party may offer evidence demonstrating that the degree of pollution, impairment or destruction does not rise to such a level as to require judicial intervention. Therefore, to the extent that *Manchester Environmental Coalition* limits the meaning of the word "unreasonable," in the context of an independent suit under CEPA, to anything that is more than de minimis, we are constrained to abandon that suggestion.[32]

---

[32] The defendants also point to *Gardiner* v. *Conservation Commission*, 222 Conn. 98, 608 A.2d 672 (1992), as support for the trial court's interpretation of unreasonable impairment. In *Gardiner*, we stated: "Even minimal environmental harm is to be avoided if, 'considering all relevant surrounding

Having determined that the term "unreasonable" as used in the context of an independent action under CEPA does *not* mean something more than de minimis, we next turn to the question of what it *does* mean, at least in the context of this case. We conclude that when, as in the present case, as we discuss in more detail later in this opinion, the legislature has enacted an environmental legislative and regulatory scheme specifically designed to govern the particular conduct that is the target of the action, that scheme gives substantive content to the meaning of the word "unreasonable" as used in the context of an independent action under CEPA. Put another way, when there is an environmental legislative and regulatory scheme in place that specifically governs the conduct that the plaintiff claims constitutes an unreasonable impairment under CEPA, whether the conduct is unreasonable under CEPA will depend on whether it complies with that scheme.

We draw this conclusion from the overriding principle that statutes should be construed, where possible, so as to create a rational, coherent and consistent body of law. See, e.g., *Doe* v. *Doe*, 244 Conn. 403, 428, 710 A.2d 1297 (1998) ("we read related statutes to form a consistent, rational whole, rather than to create irrational distinctions"); *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992) (" '[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law' "). It would be inconsistent with that principle to

circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.' " Id., 109, quoting General Statutes § 22a-19 (b). We note that this language applies to *agency determinations* in "administrative, licensing or other proceedings . . . ." General Statutes § 22a-19 (b). Today's holding does nothing more than ensure that, when a court remands an issue to an agency, the agency examines relevant statutes as part of its examination of "relevant surrounding circumstances and factors . . . ." General Statutes § 22a-19 (b).

conclude, absent some clear indication to the contrary, that the legislature intended that the same conduct that complies with an environmental legislative and regulatory scheme specifically designed to govern it, nonetheless could be deemed by a court to be an unreasonable impairment of the environment. Put still another way, it would be anomalous to conclude that the legislature has, as a general matter, enacted an environmental regulatory scheme that runs on two different tracks with respect to the same conduct: one that requires compliance with specific criteria promulgated by a regulatory agency pursuant to a specific legislative enactment; and a second that lodges in a court the determination of whether the same conduct comes within the very general standard of reasonableness, irrespective of whether it is in compliance with those specific criteria. Thus, in the present case, because we conclude, as the following discussion indicates, that, because the trial court found in effect that the Shepaug River is a stocked watercourse, and because both the defendants and the department have in this appeal assumed the propriety of that finding, the minimum flow statute and the regulations adopted pursuant to it apply to the Shepaug River. Therefore, the question of whether the impairment of the Shepaug River is unreasonable depends on whether its impaired flow meets the requirements of that statute and those regulations.

In this connection, we acknowledge that, as our previous discussion regarding the legislative rejection under CEPA of the exhaustion doctrine demonstrates, when CEPA was enacted there was significant legislative skepticism regarding the efficacy of the environmental regulatory agencies and, therefore, the legislature evinced an attitude favoring initial judicial, as opposed to initial regulatory, determinations of whether specific questioned conduct constituted unreasonable pollution, impairment or destruction of a natural resource.

Concurrent with and subsequent to that enactment, however, the legislature also has enacted numerous environmental regulatory programs, and it can hardly be said that our environmental regulatory agencies have lain dormant in implementing those programs.[33] In order to read our environmental protection statutes so as to form a consistent and coherent whole, we infer a legislative purpose that those other enactments are to be read together with CEPA, and that, when they apply to the conduct questioned in an independent action under CEPA, they give substantive content to the meaning of the word "unreasonable" in the context of such an independent action.

Furthermore, a contrary conclusion would also mean that, in defending against what a court deems to be a prima facie case of unreasonable conduct under CEPA, the only defense that could be offered would be the affirmative defense that there was no feasible and prudent alternative to the defendant's conduct. As will be

---

[33] For example, General Statutes §§ 26-141a through 26-141c, regulating the minimum stream flow for stocked rivers, was enacted during the 1971 legislative session, when CEPA was enacted. Furthermore, since the passage of CEPA in 1971, the legislature has enacted numerous environmental statutes that purport to regulate certain activities and set various compliance standards. See, e.g., General Statutes §§ 22a-36 through 22a-45 (Inland Wetlands and Watercourses Act, initially enacted in 1972); General Statutes §§ 22a-67 through 22a-76 (establishing state policy on noise pollution control, initially enacted in 1974); General Statutes §§ 22a-90 through 22a-112 (Coastal Management Act, initially enacted in 1978); General Statutes §§ 22a-114 through 22a-134q (state policy on handling of hazardous waste, initially enacted in 1980); General Statutes §§ 22a-163 through 22a-165g (creation of low-level radioactive waste facility, initially enacted in 1987); General Statutes §§ 22a-227 through 22a-229 (municipal solid waste management plan, initially enacted in 1985); General Statutes §§ 22a-257 through 22a-265 (Connecticut Solid Waste Management Services Act, initially enacted in 1973); General Statutes §§ 22a-354g through 22a-354bb (establishment of aquifer protection areas, initially enacted in 1989); General Statutes §§ 22a-365 through 22a-378 (Water Diversion Policy Act, initially enacted in 1982); General Statutes §§ 23-65f through 23-65qv (forest practices, initially enacted in 1986).

seen in our subsequent discussion of the minimum flow statute, however, in numerous areas the legislature has chosen to enact detailed regulatory schemes circumscribing a party's conduct. There is nothing in CEPA, or in its legislative history, to suggest that CEPA was intended to trump more specific statutes reflecting the legislature's environmental policy in a specific area. It is reasonable to conclude, therefore, that when the legislature has enacted a specific statutory scheme concerning conduct that is later complained of, it also intended that a party be able to offer evidence of compliance with that statute which, if believed, would rebut a prima facie showing under CEPA. Therefore, we do not interpret the term "unreasonable" in such a way as to relegate defendants in CEPA actions to the *sole* affirmative defense that there was no feasible and prudent alternative to their conduct.

### 3

### The Minimum Flow Statute

Having concluded that whether a watercourse has been unreasonably impaired may depend on a relevant regulatory scheme established by the legislature, we turn to Waterbury's claim regarding the minimum flow statute. Waterbury claims that flow in the Shepaug River is regulated by the minimum flow statute. Therefore, Waterbury asserts, as long as it was in compliance with that statute and its accompanying regulations, it could not be in violation of CEPA. The defendants argue that, assuming that the minimum flow statute applies to the Shepaug River, the trial court correctly concluded that the minimum flow statute was not intended to define "unreasonable impairment" of the river, because the minimum flow statute is concerned only with the protection of fish. We agree with Waterbury, and conclude that the minimum flow statute is the standard by which

the trial court must evaluate whether Waterbury has unreasonably impaired the Shepaug River.

We first turn to the question of whether the minimum flow statute applies to the Shepaug River. "Because statutory interpretation is a question of law, our review is de novo." *Andover Ltd. Partnership I* v. *Board of Tax Review*, 232 Conn. 392, 396, 655 A.2d 759 (1995). The trial court held, on Waterbury's motion for reconsideration, that the minimum flow statute did not apply to releases from the Shepaug dam because the only indication of stocking was "evidence that relates to stream flow at a point in Roxbury, where the flow is a combination of the west branch of the Shepaug River and of the contribution of the Bantam River." There was "no evidence of stocking of the stream primarily affected by [Waterbury's] diversion of water, that is, the river between the dam and the confluence of the Bantam River."[34]

Because the trial court only referred to the stocking in terms of evidence as opposed to fact, it is unclear whether the trial court made a finding that there was stocking of the Shepaug River at Roxbury. We note, however, that the evidence reviewed by the court in this regard was undisputed at trial, and it is not challenged on appeal; only the legal consequences resulting from the alleged stocking are challenged. Moreover, on appeal, the defendants, the department and the attorney general all assume that the Shepaug River is a stocked river, but nevertheless argue, for reasons that we will discuss, that the minimum flow statute does not govern the CEPA claim. Therefore, we decide this appeal on

---

[34] In its original memorandum of decision, the trial court had found that "[t]he evidence does not establish that the *west branch* of the Shepaug River is a stream which the commissioner stocks with fish, though a private association of fishermen, the Washington Rod and Gun Club, does so. The cited statute and effectuating regulations thus have not been shown to apply." (Emphasis added.)

the assumption that the Shepaug River is stocked at Roxbury.[35]

Given this assumption, we address the trial court's conclusion that for the minimum flow statute to apply to the Shepaug River, stocking must occur at the area "primarily affected by the . . . diversion," which in this case is the area between the Shepaug dam and the confluence with the Bantam River. Section 26-141a defines the scope of the minimum flow statute and provides: "Whenever any dam or other structure is maintained in this state which impounds, or diverts, the waters of a river or stream which is stocked with fish by the Commissioner of Environmental Protection, or *which dam or other structure affects the flow of water in such a stocked river or stream*, the commissioner may promulgate regulations setting forth standards concerning the flow of such water in accordance with section 26-141b." (Emphasis added.) Section 26-141b required the department, on or before July 1, 1973, to "promulgate regulations establishing instantaneous minimum flow standards and regulations for all stocked river and stream systems."

Section 26-141a-3 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "These regulations shall apply to *any dam* or other structure which impounds, or *diverts waters, located on those watercourses* which are listed in an annual publication

---

[35] On remand, the defendants are free to argue that the Shepaug River is not a stocked watercourse based, not on the location of the stocking but, as will be explained shortly, on the ground that there was no stocking anywhere on the Shepaug River. We note, however, that after the trial court released its original memorandum of decision; see footnote 34 of this opinion; Waterbury filed a motion to reopen the record and for permission to adduce additional evidence, namely, a certified copy of the department's Connecticut Fish Distribution Report, which listed Roxbury as a stocking point in 1999. The trial court denied the motion. If, at a new trial, the court admits this document into evidence, it appears unlikely that the argument that the Shepaug River is not stocked will be successful.

by the Commissioner of stocked watercourses and their tributaries, or parts thereof . . . ." (Emphasis added.) Section 26-141a-2 (j) of the regulations defines a " '[s]tocked watercourse' " as *any watercourse and its tributaries* into which the Commissioner or his agent shall have ordered or directed to be placed therein any species of trout, charr, salmon or their hybrid, or any other commercial or game fish, regardless of age or size." (Emphasis added.) There is nothing in the regulations to suggest that a watercourse may be divided such that the regulations apply to only that portion of the watercourse where the stocking occurs. Nor is there any language that would indicate that the minimum flow statute applies only downstream of the stocking point. Thus, we conclude that, as long as stocking occurs somewhere along the Shepaug River or its tributaries, the entire river is regulated under the minimum flow statute. We therefore decide this question on the basis on which it has been briefed and argued in this court; see, e.g., *Aetna Life & Casualty Co.* v. *Union Trust Co.*, 230 Conn. 779, 788 n.5, 646 A.2d 799 (1994) ("we decide this case on the basis on which it was tried and decided in the trial court, and briefed and argued in this court"); namely, that the Shepaug River is a stocked watercourse within the meaning of the minimum flow statute.

We now turn, therefore, to Waterbury's claim that the trial court improperly declined to apply the minimum flow statute in determining whether Waterbury's releases from the Shepaug dam violated CEPA. The trial court concluded that "minimum stream flows applicable to state-stocked fishing areas do not establish the standard for adjudicating impairment under [CEPA]. The CEPA does not adopt as a standard the flow rate set forth in [General Statutes] § 26-141, which is concerned with the narrow issue of fish, not with the overall environmental status of the river with regard to the broader

public interests protected by the CEPA." We disagree, and conclude that the minimum flow statute provides the applicable standard for determining to what extent the Shepaug River is impaired under CEPA.

The question of whether the minimum flow statute defines the standard by which the trial court was required to evaluate the defendants' CEPA claim presents a question of statutory interpretation. Section 26-141b instructs the commissioner of the department to "promulgate regulations establishing instantaneous minimum flow standards and regulations for all stocked river and stream systems." The legislature gave the commissioner detailed guidance concerning the criteria to be used when developing these regulations. For example, the commissioner is charged with "recognizing and providing for the needs and requirements of public health, flood control, industry, public utilities and water supply, and further recognizing and providing for stream and river ecology, the requirements of aquatic life, natural wildlife and public recreation, and . . . considering the natural flow of water into an impoundment or diversion . . . ." General Statutes § 26-141b. Furthermore, "[s]uch instantaneous minimum flow standards and regulations shall: (1) Apply to all river and stream systems within this state which the commissioner finds are reasonably necessary to keep a sufficient flow of water to protect and safely maintain the fish placed therein by him pursuant to his stocking program; (2) *preserve and protect the natural aquatic life*, including anadromous fish, contained within such waters; (3) *preserve and protect the natural and stocked wildlife* dependent upon the flow of such water; (4) promote and protect the usage of such water for *public recreation*; (5) be consistent with the needs and requirements of *public health, flood control, industry, public utilities, water supply, public safety, agri-*

*culture* and other lawful uses of such waters." (Emphasis added.) General Statutes § 26-141b.

Nothing in the language of this statute suggests that it is concerned only with the narrow issue of maintaining the safety of fish, as the trial court concluded. Instead, the factors required to be considered by the department when establishing the minimum flow levels encompass a wide variety of concerns and competing interests over and above that of maintaining the fish in the stocked streams. Moreover, subdivisions (2), (3), (4) and (5) of § 26-141b concern natural unstocked wildlife, aquatic life in the water, public recreation and health, flood control, industry, public utilities, water supply, public safety, agriculture, and other lawful uses of the water. In addition, an examination of several other regulations, enacted to enforce the minimum flow statute, reinforce the fact that the legislature and the department were concerned with more than protecting fish. Section 26-141a-4 (a) (3) of the Regulations of Connecticut State Agencies allows the department to grant exemptions or variances from the minimum flow statute, but only after taking into consideration numerous factors, including the "preservation, protection and safe maintenance of the river and stream stocking program . . . ."[36] This section also provides a procedure by

---

[36] Section 26-141a-4 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "In determining whether to grant an exemption or variance under this section, upon receipt of a petition from the operator of an impoundment or diversion, the Commissioner shall include, but is not limited to, consideration of whether operation of the structure will:

"(1) Prevent the maintenance of viable pools, channels, or other water basins, or allow their undue depletion by normal evaporation and aquifer absorption;

"(2) Reduce oxygen content below minimal levels, cause stagnation, or inhibit reproductive cycles (where that potential exists);

"(3) Prevent the preservation, protection and safe maintenance of the river and stream stocking program, the natural aquatic life contained in such waters (including anadromous fish), and the natural or stocked wildlife dependent upon the flow of such water, and the availability of such water for public recreational uses; or

"(4) Meet the needs and requirements for public health, flood control,

which a municipality may seek a variance where the department determines that a water supply emergency exists, or is likely to exist. Regs., Conn. State Agencies § 26-141a-4 (b). Additionally, § 26-141a-6 (f) of the regulations provides that "no release shall be required which is in excess of the natural flow of water into the impoundment or diversion on that day." Thus, it is clear that the legislative and regulatory scheme envisions a comprehensive plan to be developed for the regulation of water flow of stocked watercourses in the state.

The legislative history confirms that this act was concerned with providing a healthy environment for more than just fish. Although the bill establishing the minimum flow statute was drafted by the Connecticut Fly Fishermen's Association, it is clear that their aim went far beyond ensuring that they would have sufficient water in which to fish. The coauthor of the bill, Mark Levy, stated: "[W]e feel that we have a workable piece of legislation here, which will provide and solve the problem of low flow in certain streams in the state. . . . I believe this bill takes care of the requirements of the water companies and the requirements of the public utilities, power companies. We are not asking them to empty their pilements . . . what we are asking is that standards be set forth by water resources to [require] a minimum amount of water to come out of these impoundments so that the ecology of the stream will be maintained, so that the stocking program can be kept in good condition, and for the general benefit of the public, canoeing recreation etc., that all of our streams will produce." Conn. Joint Standing Committee Hearings, supra, pp. 250–51. Another member of the association testified that his organization was "particularly interested in this legislation because we feel it is essential for the proper environmental control of our

industry, public utilities, water supply, water quality, electric power production, public safety, agriculture, and other lawful uses of such waters. . . ."

natural waterways. . . . It seems logical that users of our waterways not just for power or water supply be taken into consideration . . . when we tamper with the actual flow of fresh water in the state. This includes recreational uses, ecological needs of humans, and wild life in the area." Id., p. 250, remarks of A. F. Turamo.[37]

[37] A third member of the Connecticut Fly Fishermen's Association, Edward Poriss, commented: "There are many instances in this state where streams are dried up . . . by closed impoundments or diversions of water during low-flow months. In many of these instances, more water could be released down stream without harming the situation for which water is impounded or diverted. This release of water benefits the entire ecology downstream, all the wildlife dependent upon a flow of water . . . and promotes an improved health situation. . . . At first glance, it may seem that this bill emphasizes water flow for the benefit of stocked fish. This purely practical way of underlining the fact that it makes sense to protect the investment of the taxpayers of the state. . . . We . . . recognize the primary needs of the water companies, small and large, to supply clean water to their customers, and to insure an adequate supply. . . . This bill takes these needs into consideration and does not ask for an unreasonable release of water. . . . Much information on the flow of these rivers and streams is already available, and there are acceptable scientific methods for calculating low flow needs, and thereby, safe amounts to release. This bill asks the experts in the Water Resources Commission to decide these amounts after taking into consideration all the possible uses for this water. . . . This is not intended as a restrictive or punitive bill at all. This is much more a bill to establish a sensible *public policy* concerning streams and rivers for the benefit of the entire environment." (Emphasis in original.) Conn. Joint Standing Committee Hearings, supra, p. 246.

In addition to members of the Connecticut Fly Fisherman's Association, several other citizens spoke in favor of the proposed legislation. "Our ecology at present time is a very important issue, this is part of this whole program which will support and provide adequate supply of water for the aquatic life in the rivers and streams feeding them. It will also provide for an adequate supply of water for the utilities." Id., pp. 233–34, remarks of Representative Earl T. Holdsworth. "The important principle is that we are planning for the future and water should be and must be considered for all valid uses, and one use should not unnecessarily be tended to the detriment of another. There is no longer any logic in allowing future water supply and power developments to operate so as to divert water for consumptive use from the natural water course to the limit that the stream can no longer sustain aquatic life or support water shed recreation; or to allow the regulation of flows so as to periodically leave the stream inhospitable for the life or use which it normally supports." Id., p. 264, remarks of Alfred Hunyadi, assistant director of the state board of fish.

A further example of how this bill sought to balance multiple competing interests can be seen from concerns expressed by representatives from both the state health department and the Connecticut Waterworks Association. They spoke in opposition to the bill, arguing that, at the very least, the minimum flow statute should apply only to dams built after the passage of the legislation. "[Applying this bill to all dams] could result in diminishment of safe yield available for public water supply from present reservoirs . . . ." Id., p. 253, remarks of Richard Woodhall, chief of the water supply section of the state health department. "I think we all recognize that some of the dams in the state . . . have been in existence for over 100 years and that they have entered into the planning of the water companies and their supplying of the water needs of our people. To impose at this time, a legislation which would diminish the amount of water that they would have to release . . . would seriously interfere with [the] tremendous amount of planning that [has] gone into the water needs of our state. I would think that [at a] minimum the present existing dams or structures should be [excepted] from any such legislation." Id., p. 257, remarks of William Glynn, Connecticut Waterworks Association. Although this recommendation was not specifically reflected in the legislation as enacted, § 26-141a-6 of the Regulations of Connecticut State Agencies does set two release standards, one for dams or impoundments existing at the time the regulations went into effect, and one for new dams or impoundments.

On the basis of the language of § 26-141b and its legislative history, we conclude that the minimum flow statute was intended not only to protect the state's fish stocking program, but was designed to accommodate many interests and concerns, including having sufficient water available for "natural aquatic life," "natural

and stocked wildlife," and "public recreation."[38] We therefore reject the trial court's conclusion to the contrary.

The defendants also contend that CEPA was intended to prevent precisely what we are permitting here, namely, allowing a statute that encompasses a variety of interests to take precedence over CEPA, which is concerned solely with the health of a particular natural resource. In other words, the defendants argue that the "unreasonable impairment" of the Shepaug River must be measured by a standard that considers *only* the health of that river, not by a statute of more general applicability, developed with interests other than those concerning the health of *only* the Shepaug River. We find nothing in the language, purpose or legislative history of CEPA to support this claim. Although, as the intervenor fund points out, the legislature passed CEPA in part due to great frustration with the perceived inadequacy of the then existing administrative agencies,[39] this

---

[38] The trial court found that: "The defendants established . . . that the effect of reducing flow to the extent that [Waterbury] does during the summer months reduces the amount of wet stream bed, the habitat for the insects that are part of the river's ecology. They also proved that [Waterbury's] diversion of water reduces the aesthetic appeal of the river, since large areas are left dry and parched-looking more frequently than would be their natural state." Although insect habitat is not specifically addressed in the minimum flow statute, it is clear that the statute was intended to protect the ecology of the river, which includes insects. As for aesthetics, this factor could have been addressed as part of ensuring sufficient water for public recreation, which could include sightseeing. Even if these two factors were not addressed, however, this does not prevent the legislature from giving specific substantive shape to the general directive of CEPA, as was done here, albeit the legislature did not specifically address every conceivable environmental concern.

[39] See, e.g., 14 H.R. Proc., supra, p. 745, remarks of Representative Collins ("In 1967 we passed a [very] significant water pollution bill. We did the same thing with the clean air bill in 1969. If those bills and the programs implementing those bills had been properly and thoroughly carried out by the state agencies . . . it might just be that a bill of this nature would not be necessary."); 14 S. Proc., supra, p. 1090, remarks of Senator Stanley J. Pac ("I am convinced that our ability to clean up the air in our environment,

is reflected, as discussed previously, in the absence of the exhaustion doctrine from CEPA. There is no indication that the legislature intended to have the significant amount of substantive environmental legislation that it has passed subsequent to CEPA be trumped by CEPA.

The defendants also argue that, regardless of the intent behind the minimum flow statute, the regulations as currently drafted have no ecological underpinnings, and do not adequately protect the health of the Shepaug River. The defendants point to the testimony of two department employees, who both stated that they were unaware of any ecological foundation for the regulations.[40] To buttress this claim, the defendants note that the department submitted a proposed injunction recommending that the trial court order Waterbury to release between six and forty times more water in the summer and 130 times more water in the winter than required by the minimum flow regulations.

The challenged regulations became effective on April 24, 1979. No documentation could be found, however, to explain the basis of the regulations. Considering that

rests not so much on this legislation, some small legislation, but rather, in the courts of this land").

[40] Thomas Morrissey, director of the planning and standards division in the water management bureau of the department, testified as follows:

"Q. Okay. Are you aware of any ecological basis for the minimum stream flow standards?

"A. No, I'm not. As a matter of fact, there's not . . . I don't believe there's an ecological basis to them at all."

Richard Jacobson, supervising fisheries biologist in the fisheries division of the bureau of natural resources of the department, testified as follows:

"Q. Okay. Mr. Rooney was talking with you yesterday about the minimum stream flow policy or regulation for the state of Connecticut. I wanted to ask you, are you aware of what—whether there is any scientific or ecological foundation for that regulation?

"A. I have not found any information in any of the files at [the department] that I have been able to search to find any ecological justification for those numbers."

these regulations were crafted more than twenty years ago, however, absent some evidence that the department did not attempt to comply with the legislative mandate of § 26-141b, we must presume that the department crafted the minimum flow regulations in compliance with the guidelines of § 26-141b. In the absence of clear indication to the contrary, public officials are presumed to act according to governing law. *State* v. *Figueroa*, 235 Conn. 145, 180, 665 A.2d 63 (1995) ("there is a presumption that public officials entrusted with specific public functions related to their jobs properly carry out their duties"); *Beechwood Garden Tenants' Assn.* v. *Dept. of Housing*, 214 Conn. 505, 515, 572 A.2d 989 (1990) ("it must be presumed that public officials have performed their statutory duties, in the absence of substantial evidence to the contrary"). Given that presumption, we cannot legitimately simply ignore these regulations based on the testimony of officials, given some twenty years after the regulations were drafted, who did not even take part in creating the regulations. If the department now concludes that its regulations do not adequately meet the concerns expressed in § 26-141b, it is free to craft new regulations.

The defendants also list several features of the regulations that allegedly undermine the idea that they were intended to protect more than the health of fish. First, the defendants point out that the regulations only apply to stocked streams, and then only to those that the department believes need regulation for "the protection and maintenance of such stocking . . . ." Regs., Conn. State Agencies § 26-141a-3 (a). Second, the regulations contain provisions for an operator of a diversion to avoid compliance with the regulations through (1) variances, (2) exemptions and (3) declaration of a water supply emergency. Regs., Conn. State Agencies § 26-141a-4. The defendants assert that these features make

the regulations an inappropriate standard by which to judge the impairment of a watercourse. We disagree with the defendants that these regulations require the conclusion that the minimum flow statute is confined to the issue of fish safety. Although the legislature chose to use stocked streams as the defining focal point for the water management scheme that it devised, we do not read that as also meaning that the only interests protected by the legislation are those of the fish that stock the water. To do so would be to ignore the other specific interests enumerated in the same legislation. Moreover, it is not critical that the regulations contain provisions allowing water companies to obtain exemptions from compliance under certain conditions. That is the water management scheme that has been constructed by the legislature.

Under the circumstances of this case, therefore, we conclude that whether the degree of impairment of the Shepaug River resulting from the dam was unreasonable within the meaning of CEPA must be determined by whether the flow in the Shepaug River meets the requirements of the minimum flow statute and the regulations promulgated thereunder. The trial court improperly concluded as a matter of law that the minimum flow statute did not apply to Waterbury. A new trial is therefore required as to the parties' CEPA claims.[41]

---

[41] At trial, Waterbury also claimed that the Connecticut Water Diversion Policy Act, General Statutes § 22a-365 et seq. (diversion act), insulated it from any claim under CEPA. The diversion act put into place a system that required a party to obtain a permit from the department in order to divert water. As part of the scheme, any person or municipality that had maintained a diversion prior to or on July 1, 1982, was exempted from the permit process, as long as it properly registered its diversion with the department on or before July 1, 1983. See General Statutes § 22a-368. The trial court found that Waterbury "duly registered its diversion of water from the west branch of the Shepaug River." The trial court rejected, however, Waterbury's claim that "such registration insulates the diversion that existed in 1983 from further scrutiny by way of a claim of unreasonable impairment of the public trust in a natural resource under CEPA." The trial court concluded that, because the "[d]iversion [a]ct contains no provision exempting existing

In this connection, we address the discretion that the trial court has under § 22a-18 (b) concerning whether to remand to the department questions concerning Waterbury's compliance with the minimum flow statute. Section 22a-18 (b) provides: "If administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, *the court in its discretion may remand the parties to such proceedings*. In so remanding the parties the court may grant temporary equitable relief where necessary for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction and the court shall retain jurisdiction of the action pending completion of administrative action for the purpose of determining whether adequate consideration by the agency has been given to the protection of the public trust in the air, water or other natural resources of the state from unreasonable pollution, impairment or destruction and whether the agency's decision is supported by competent material and substantial evidence on the whole record." (Emphasis added.) See footnote 17 of this opinion for the text of the entire statute.

As we explained in part I A of this opinion, this language indicates that the legislature intended to supplant the exhaustion doctrine and to permit courts to hear

---

diversions from the coverage of CEPA . . . [t]he plain and only effect of the registration provision is to relieve those with existing diversions from the need to file an application for a permit, not to render such diversions immune from regulation under other statutes." On this appeal, Waterbury has not reasserted its claim that its compliance with the diversion act either bars, or, like its claim under the minimum flow statute, sets the standard under which any claim of unreasonable impairment must be measured. In light of our conclusion, however, that whether a watercourse has been unreasonably impaired may depend on the relevant regulatory scheme established by the legislature, at the new trial it will be incumbent upon the trial court to examine the entire statutory scheme affecting the alleged impairment. Therefore, the court also should address the effect of the diversion act on the CEPA claim.

environmental claims, even where an administrative agency is available to hear the claim. Although a party may initially bypass an agency and bring an action to the court, § 22a-18 (b) makes clear that the court may then remand the matter to that agency for a particular determination. This provision statutorily invokes the judicial doctrine of primary jurisdiction.

"The doctrine of primary jurisdiction is a rule of judicial administration created by court decision in order to promote 'proper relationships between the courts and administrative agencies charged with particular regulatory duties.' *United States* v. *Western Pacific R. Co.*, 352 U.S. 59, 63, 77 S. Ct. 161, 1 L. Ed. 2d 126 [1956]. Its basis is the concept that courts and administrative agencies are, as Justice Frankfurter suggested, 'collaborative instrumentalities of justice.' *United States* v. *Morgan*, 313 U.S. 409, 422, 61 S. Ct. 999, 85 L. Ed. 1429 [1941]." *Mazzola* v. *Southern New England Telephone Co.*, 169 Conn. 344, 348, 363 A.2d 170 (1975). Under this doctrine, a trial court "has original subject matter jurisdiction of the questions raised in the complaint filed in that court. Primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *United States* v. *Western Pacific R. Co.*, supra, 64. . . . [A] court may not refer a controversy within its jurisdiction to an agency under this doctrine where the agency itself lacks jurisdiction; the court's jurisdiction in such cases is exclusive. *Collens* v. *New Canaan Water Co.*, 155 Conn. 477, 480–81, 234 A.2d 825 [1967]; 73 C.J.S., Public Administrative Bodies and Procedure, § 40." (Citations

omitted; internal quotation marks omitted.) *Mazzola* v. *Southern New England Telephone Co.*, supra, 349.

"In deciding whether to apply the primary jurisdiction doctrine to a given case, a court must take into account the need for uniform decisions and the specialized knowledge of the agency involved." *Fulton Cogeneration Associates* v. *Niagara Mohawk Power Corp.*, 84 F.3d 91, 97 (2d Cir. 1996); see also *Golden Hill Paugussett Tribe of Indians* v. *Weicker*, 39 F.3d 51, 58–59 (2d Cir. 1994) ("[p]rimary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body"). "As a threshold matter, of course, a court must find that the agency has jurisdiction over the issue presented." *Fulton Cogeneration Associates* v. *Niagara Mohawk Power Corp.*, supra, 97. We leave to the informed discretion of the trial court on retrial the question of whether to remand to the department the question of compliance with the minimum flow statute, to be determined in accordance with the standards embodied in the doctrine of primary jurisdiction.

## II

## RIPARIAN RIGHTS

Waterbury also claims that the trial court improperly determined that it had not established a prescriptive easement to use the waters of the Shepaug River and, consequently, had interfered with the riparian rights of the defendants.[42] Specifically, Waterbury takes issue

---

[42] At trial, Waterbury asserted this claim against all of the defendants. On appeal, however, Waterbury does not challenge the trial court's ruling with respect to Washington. Thus, the term defendants, as used in part II of this opinion, only refers to Roxbury, the Roxbury Land Trust, Inc., the Shepaug River Association, Inc., and the Steep Rock Association, Inc.

with the trial court's conclusion that its long-standing use of the Shepaug dam was not sufficiently open and visible so as to satisfy those elements necessary to establish a prescriptive easement. Waterbury contends that the mere presence of the Shepaug dam made its interference with the defendants' riparian rights open and visible. The defendants assert, as the trial court found, that "[i]t is the level of Waterbury's use that was required to be open and visible, not the mere usage of the water itself." We agree with Waterbury.

Before addressing the merits of Waterbury's claim, we briefly set forth the appropriate standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 122, 788 A.2d 83 (2002). Because, in the present case, Waterbury contests the correctness of the trial court's legal conclusion,[43] our review is plenary.

We begin our analysis of this issue by setting forth the requirements for establishing a prescriptive easement. "[General Statutes §] 47-37 provides for the acquisition of an easement by adverse use, or prescription. That section provides: 'No person may acquire a right-of-way or any other easement from, in, upon or over the land

---

[43] The defendants argue that Waterbury is challenging only the factual basis for the trial court's decision. Waterbury clearly asserts in its brief, however, that based upon the trial court's factual determination that "the Shepaug dam [was] an open and visible barrier on the river since 1933," it was an error, *as a matter of law*, to conclude that Waterbury had not established the open and visible elements of its prescriptive easement claim.

of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years.' In applying that section, this court repeatedly has explained that '[a] party claiming to have acquired an easement by prescription must demonstrate that the use [of the property] has been open, visible, continuous and uninterrupted for fifteen years and made under a claim of right.' *Westchester* v. *Greenwich*, 227 Conn. 495, 501, 629 A.2d 1084 (1993)." *Crandall* v. *Gould*, 244 Conn. 583, 590–91, 711 A.2d 682 (1998). The purpose of the open and visible requirement is to give "the owner of the servient land knowledge and full opportunity to assert his own rights." *Klein* v. *DeRosa*, 137 Conn. 586, 588–89, 79 A.2d 773 (1951). "To satisfy this requirement, the adverse use must be made in such a way that a reasonably diligent owner would learn of its existence, nature, and extent. Open generally means that the use is not made in secret or stealthily. It may also mean that it is visible or apparent. . . . An openly visible and apparent use satisfies the requirement even if the neighbors have no actual knowledge of it. A use that is not open but is so widely known in the community that the owner should be aware of it also satisfies the requirement." (Internal quotation marks omitted.) 1 Restatement (Third), Property, Servitudes § 2.17, p. 273 (2000). "Concealed . . . usage cannot serve as the basis of a prescriptive claim because it does not put the landowner on notice." J. Bruce & J. Ely, Jr., Easements and Licenses in Land (2001) § 5:12, pp. 5-36 through 5-37. A typical example of such a concealed use involves an asserted easement in an underground sewer or pipeline. Id., p. 5-37.

The trial court in the present case found that Waterbury's "adverse conduct [has not been] open and visible. The presence of the Shepaug dam has certainly been an open and visible barrier on the river since 1933. The operation of that dam is not, however, open and visible

as *a cause of low flow* in the river. At some times of the year, [Waterbury] diverts no water from the Shepaug River by way of the dam and aqueduct. The flow of the river is subject to natural changes caused by rain and runoff. [Waterbury's] diversion of the flow takes place through the operation of controls in the dam face, on property owned by [Waterbury] to which access is restricted." (Emphasis added.)

Waterbury subsequently moved for reconsideration with respect to the issue of whether it had established a prescriptive easement. In its memorandum of decision on the motion, the trial court both affirmed and elaborated upon its earlier decision, explaining: "[T]he mere presence of the dam and its infrastructure did not constitute notice that Waterbury was impairing these defendants' riparian rights by the method of its operation of the dam. The mechanism for controlling the diversions was not open and visible to the downstream landowners but was on restricted-access land owned by Waterbury. The variations in the flow of the river were affected by variations in rainfall, so that variations were not openly and visibly the results of the actions of Waterbury. . . . Waterbury [has] two sources of water: the Shepaug and the Wigwam watershed, seven miles away. The fact that Waterbury operated its public water system did not serve as an open and visible impairment of the defendants' rights, since Waterbury was able to supply its citizens' needs for water from the three reservoirs on its own land in the Wigwam watershed, with a capability of using water from the Shepaug *only to an extent that did not create any open, visible impairment of the flow of the river*. The evidence established that Waterbury's impairment of these defendants' riparian rights was not open and visible until Waterbury made major changes in the way it operated its water system in 1988–89, a period less than fifteen years prior to the institution of the defendants' counterclaim for injunctive relief

against impairment of their riparian rights." (Emphasis added.)

In other words, the trial court concluded that, because Waterbury had, until 1988–89, taken most of its water from the Wigwam reservoir, the amount of water it took from the Shepaug River was insufficient for a downstream riparian owner to be put on notice that Waterbury was using the Shepaug dam to divert a portion of that river's natural flow. After the water treatment plant was constructed, however, Waterbury diverted more water from the Shepaug River and less from the Wigwam watershed, because water from the Wigwam had to be pumped uphill to the treatment plant, while water diverted from the Shepaug River to the treatment plant via the aqueduct tunnel could be gravity fed. Because Waterbury began taking significantly more water from the Shepaug River after completion of the water treatment plant, the trial court found that from that point forward, a downstream riparian would have been able to distinguish that there was a decrease in flow down the Shepaug River resulting from the operation of the Shepaug dam.

In order to resolve the question of whether, under prescriptive easement law, the "open and visible" requirement applied to the impairment of the flow of the Shepaug River by virtue of the presence of the dam, as Waterbury contends, or to the impaired level of that flow by virtue of how Waterbury managed the flow, as the defendants contend, it is necessary first to determine the theory of riparian rights that pertained in this state at the relevant times. That is because, if Connecticut followed the natural flow theory of riparian rights during the period in question, then it is logical to conclude that any impairment of those riparian rights that was open and visible satisfies that requirement.

We conclude that, until 1982, Connecticut followed the natural flow theory of riparian rights. We also con-

clude that, under the natural flow theory of riparian rights, the mere presence of the Shepaug dam was sufficient to satisfy the open and visible requirement necessary to establish a prescriptive easement. Although we conclude, however, that Waterbury has obtained a prescriptive easement as against the defendants' riparian rights, we remand this issue to the trial court for a determination of the extent of Waterbury's prescriptive easement.

Thus, in order to determine whether Waterbury's conduct was open and visible, we first determine the extent of the riparian rights of the defendants. "A riparian proprietor is an owner of land bounded by a watercourse or lake or through which a stream flows, and riparian rights can be claimed only by such an owner." *Harvey Realty Co.* v. *Wallingford*, 111 Conn. 352, 358, 150 A. 60 (1930). Until 1982, Connecticut subscribed to the natural flow theory of riparian water rights.[44] The natural flow theory provides that "[e]ach riparian owner on a waterbody is entitled to have the water flow across, or lie upon, the land in its natural condition, *without alteration by others of the rate of flow or the quantity or quality of the water.*" (Emphasis added.) J. Dellapenna, 1 Waters and Water Rights (R. Beck ed., 1991) § 7.02 (c), p. 233; see also *Harvey Realty Co.* v. *Wallingford*, supra, 359–60 ("Each riparian owner is limited to a reasonable use of the waters, with due regard to the rights and necessities of other such owners. It is the common right of all to have the stream preserved in its natural size, flow, and purity, without material diversion or pollution.").

The natural flow theory was last reaffirmed in *Dimmock* v. *New London*, 157 Conn. 9, 15–16, 245 A.2d

---

[44] The diversion act; see footnote 41 of this opinion; was passed in 1982. That act transformed the state into a "regulated riparian" jurisdiction, one implication of which will be discussed later in this opinion.

569 (1968).[45] In *Dimmock,* the plaintiff riparian owners sought to enjoin the defendant city from diverting water into its reservoir. Id., 11. The defendant was facing a severe drought, and had dug a canal between one of its reservoirs and a smaller body of water on its property. Id. As a result, almost one half of the water that once flowed through the plaintiffs' lands was diverted through the canal and into the reservoir. Id., 12.

In concluding that the plaintiffs were entitled to at least nominal damages, we stated: "A riparian owner is entitled to the natural flow of the water of the running stream through or along his land, in its accustomed channel, *undiminished in quantity* and unimpaired in quality. . . . Since it is a right which may be affected by prescription, the lower riparian owner is deemed to be injured as to such rights by *any unlawful diversion*

---

[45] Neither party addresses, let alone disputes, the position that Connecticut, at least until 1982, recognized the natural flow principles of water rights. Waterbury does assert, however, that Connecticut is currently a regulated riparian state. This claim, however, does not affect our analysis of the defendants' riparian rights as they existed, at least until 1982.

States that do not follow the natural flow theory of riparian rights follow the reasonable use theory. Under this doctrine "every riparian owner has an equal right to make a reasonable use of the water. A reasonable use is any use that does not inflict substantial harm or unreasonable injury on other riparian owners. Thus a landowner's right to use water is limited only by the harm he might cause downstream owners." J. Christman, Water Rights in the Eastern United States (K. Wright ed., 1998) p. 23. This commentator believes that Connecticut now may be a reasonable use jurisdiction. Christman states: "The reasonable use doctrine has replaced the natural flow theory in most jurisdictions, though courts occasionally still speak in 'natural flow' language. In [*Dimmock* v. *New London,* supra, 157 Conn. 15], for example, the Connecticut Supreme Court reaffirmed the natural flow theory . . . . Twelve years later the same court adopted the other rule, the reasonable use doctrine, but only in *dictum* that was not controlling for future cases." (Emphasis in original.) J. Christman, supra, p. 23. The case referred to was *Page Motor Co.* v. *Baker,* 182 Conn. 484, 438 A.2d 739 (1980). *Page Motor Co.* v. *Baker,* supra, 487, only addressed the "common enemy doctrine," however, and how parties may deal with surface water. None of the parties claim that this court, in *Page Motor Co.,* abandoned the natural flow theory and adopted the reasonable use theory. We therefore decline to read *Page Motor Co.* as doing so.

on the part of an upper proprietor regardless of any actual use of the waters of the stream by the lower riparian owner. *Regardless of any perceptible, actual damage which a lower riparian plaintiff may be able to prove* resulted from a *wrongful* diversion by an upstream defendant, such a diversion is an invasion of the rights of that plaintiff and by our law, if it is continued for the period of fifteen years, would confer a prescriptive right upon the defendant so to divert the stream." (Citations omitted; emphasis added.) Id., 14–15. "[W]here one has a right to the use of a stream naturally flowing through his land, capable of being used for a beneficial purpose, and it is diverted therefrom by another, it is not necessary for the person having such right, in an action for such diversion, to prove . . . that he sustained any specific damage by such diversion, interfering with his application of the water; but that he has a right to recover, notwithstanding he has sustained no perceptible or actual damage by such diversion." Id., 15.

Because a party can recover for a violation of its riparian rights whenever the natural flow of a watercourse is diminished in quantity, without having to prove any perceptible damage, we conclude that the mere presence of a dam is sufficient to infringe on the rights of a downstream riparian owner. As the trial court in the present case noted, "the erection of a dam across a river alters that river. *Instead of having natural flow*, including natural seasonal variations in the amount of flow, a dammed river is affected by the storage function of the dam, which operates to hold some of the water from periods of high flow for use in some manner during periods of low flow." (Emphasis added.) Because there does not have to be any "perceptible, actual damage"; *Dimmock* v. *New London*, supra, 157 Conn. 15; as long as Waterbury can prove that "a reasonably diligent owner would [have learned] of [the dam's]

existence"; 1 Restatement (Third), supra, § 2.17, p. 273; Waterbury has satisfied the open and visible requirement necessary to establish a prescriptive easement. The trial court found that "[t]he presence of the Shepaug dam has certainly been an *open and visible barrier on the river since 1933.*" (Emphasis added.) This finding is sufficient for us to conclude, as a matter of law, that Waterbury has satisfied the open and visible requirement since 1933.

Because the trial court found that Waterbury's operation of the Shepaug dam was not open and visible, it did not address whether Waterbury had satisfied the remaining elements necessary to establish a prescriptive easement, namely, that the Shepaug dam operated adversely to the defendants' riparian rights, continuously for at least fifteen years, and under a claim of right. Nonetheless, "[w]e need not remand the case for the [trial] court's decision on that issue if it can be determined as a matter of law on the record before us." *Hudson Wire Co.* v. *Winsted Brass Workers Union*, 150 Conn. 546, 552, 191 A.2d 557 (1963).

Upon reviewing the record, we conclude, as a matter of law, that Waterbury established all of the elements of a prescriptive easement as early as 1948. The trial court found that "the Shepaug dam has certainly been an *open and visible barrier on the river since 1933.*" (Emphasis added.) Because there was no evidence that the Shepaug dam ever ceased acting as an obstruction, the inference is inescapable that the dam has been a continuous barrier since 1933, a period much longer than the necessary fifteen years. As for the adversity requirement, a "[d]iversion is an act which in its nature must be considered adverse. It is of itself notice that it is adverse and in opposition to the rights of other riparian owners, since it is an act in excess of any use which the riparian owner may rightfully make of the stream." (Internal quotation marks omitted.) *S. O. & C.*

*Co.* v. *Ansonia Water Co.*, 83 Conn. 611, 624, 78 A. 432 (1910); see also 2 H. Farnham, Waters and Water Rights (1904) § 540, p. 1751. It necessarily follows that operation of the Shepaug dam was adverse to the defendants' riparian rights.

Lastly, we address the requirement that Waterbury's interference with the defendants' riparian rights be made under a claim of right. "Use made under a claim of right means use that is made without recognition of the rights of the owner of the servient tenement." (Internal quotation marks omitted.) *Crandall* v. *Gould*, supra, 244 Conn. 590. "A use by express or implied permission or license cannot ripen into an easement by prescription." (Internal quotation marks omitted.) *Putnam, Coffin & Burr, Inc.* v. *Halpern*, 154 Conn. 507, 515, 227 A.2d 83 (1967). Waterbury concedes, that with respect to Washington, its diversion was permitted pursuant to No. 252 of the 1893 Special Acts and the 1921 agreement with Washington. Thus, because Waterbury had Washington's consent to divert water from the Shepaug dam, as the trial court concluded, Waterbury did not gain any prescriptive rights as against Washington.

With regard to the other defendants, namely, Roxbury, the Roxbury Land Trust, Inc., the Shepaug River Association, Inc., and the Steep Rock Association, Inc., however; see footnote 42 of this opinion; there is no evidence, nor do they claim, that there was any such permitted use. Given these facts, we conclude, as a matter of law, that Waterbury established a prescriptive easement against the riparian rights of the other defendants.

Having determined that Waterbury has established a prescriptive easement over the defendants' riparian rights, we must determine the extent of this easement. "The extent of the right acquired is measured by the

extent to which the claim was asserted and maintained. 2 Farnham [supra], § 542. It is limited by the previous enjoyment. *Middlesex Co.* v. *Lowell*, 149 Mass. 509, 21 N.E. 872 [1889]; *Norway Plains Co.* v. *Bradley*, 52 N.H. 86 [1872]. It is determined by the actual user while it is being acquired. *Shrewsbury* v. *Brown*, 25 Vt. 197 [1853]; *Whittier* v. *Cocheco Mfg. Co.*, 9 N.H. 454 [1838]. Adverse user consists in using as one's own. *Johnson* v. *Gorham*, 38 Conn. 513, 521 [1871]; *Searles* v. *DeLadson*, 81 Conn. 133, 136, 70 Atl. 589 [1908]; *Quigg* v. *Zeugin*, 82 Conn. 437, 440, 74 Atl. 753 [1909]." *S. O. & C. Co.* v. *Ansonia Water Co.*, supra, 83 Conn. 627. On the basis of these precepts, we conclude that the scope of Waterbury's easement over the defendants' riparian rights: (1) is no more than that level of use permitted by No. 252 of the 1893 Special Acts and Waterbury's 1921 agreement with Washington, because that level of use corresponds to Waterbury's use under its claim of right; but (2) may be less than that level, if Waterbury's actual use for the period of adverse use was less than that level.

Our case law teaches that, although a party may acquire a prescriptive easement to divert all the water in a particular stream, it will only establish a prescriptive easement for an amount that has become customary between the parties. In *Adams* v. *Manning*, 48 Conn. 477, 480 (1881), the defendants operated a dam and asserted "the absolute right to take sole charge and control of the dam, and to open and close its gates without regard to the wants of the petitioners and other riparian owners below . . . ." We concluded that, based on the long operation of the dam, all the parties had adjusted their usage and that the plaintiffs "had thus acquired a right to use this stored water in the reasonable, proper and customary manner and time of using it . . . . [T]herefore, the [defendants] had not the right to continue it in existence for storage and at

their will to detain water therein or discharge it therefrom unnecessarily, unreasonably and to the injury of others; their power over it was held in strict subjection to this law of a reasonable and customary use as between themselves and other millowners below, which thirty years of such use had imposed upon them . . . ." Id., 488.

In *Osborn* v. *Norwalk*, 77 Conn. 663, 664, 60 A. 645 (1905), the city had built and maintained a dam for over thirty years and had diverted a large amount of water from the Silvermine River, to the detriment of the plaintiff. The plaintiff, although claiming to have been injured by the dam's operation since 1871, only sued over the city's behavior beginning in 1901, when the city increased its diversion, and then at times, rapidly discharged large quantities of water, flooding the plaintiff's land. Id. We held that, even if the city had established a prescriptive easement, "[a] right to a reasonable use of a riparian right does not justify its unreasonable use. . . . Nor could a right to divert water permanently from its natural course, to an extent not substantially injurious to the riparian rights of others, carry a right to divert it to an extent that was substantially injurious to them." (Citation omitted.) Id., 665.

Although it is possible to read *Adams* and *Osborn* for the proposition that a party may obtain an easement only to divert an amount of water that is not injurious to other riparian owners; see also *Wadsworth* v. *Tillotson*, 15 Conn. 366, 372–73 (1843) ("[b]ut whatever may be the rights of any proprietor, or however acquired, it must be exercised in a reasonable manner, and so as not unnecessarily to injure the rights of others"); *S. O. & C. Co.* v. *Ansonia Water Co.*, supra, 83 Conn. 611, makes clear that a party can acquire a prescriptive easement to divert *all* of the water in a particular stream.

The facts of *S. O. & C. Co.* are quite complex, however, a brief summary will be sufficient for our discus-

sion. In 1904, a property owner, Fosdick, attempted to grant to the plaintiff "a right to construct and maintain a dam across [Beaver] [B]rook, create a storage reservoir, and lay and maintain an eight-inch pipe from the dam across the grantor's property." Id., 615–16. Above this dam was a ditch, however, built in 1837 and owned by another property owner, Hubbell. Id., 613–14. "This ditch took practically *all* the water of the brook, except in times of flood, and diverted it to [a] mill site." (Emphasis added.) Id., 614. In 1869, Hubbell conveyed to the defendant water company, " 'the right to have, take, use and appropriate the water of a brook, known as Beaver Brook, for the purposes specified in the charter of the Ansonia Water Company . . . and to conduct said water through the pipes of said water company from the reservoir of said water company into said borough of Ansonia for use and consumption.' " Id.

On the question of whether the defendant had violated the plaintiff's riparian rights to the natural flow from Beaver Brook, we held: "It follows that Hubbell, when he made his grant to the defendant in 1869, had gained the right to divert the waters of the brook away from the Fosdick land, or at least that part of it which concerns the present controversy, and that Fosdick had lost the right which had once attached to that land as riparian property. The defendant is, therefore, either by force of the Hubbell grant or otherwise, not open to an action by the plaintiff, as the grantee of Fosdick, for an invasion of those rights as they originally existed . . . . These considerations lead to the conclusion that as against this plaintiff the defendant has had, during the years covered by this action, and now has, the right to divert, appropriate, and use the waters of the stream in question . . . *to the fullest extent* . . . . This being the case, *it is a matter of unconcern whether or not the diversion and appropriation which has been there made has been one increasing with the years, and*

*is now greater than ever before,* or what additional reservoirs may have been there built, or what additional or larger conduits for the conveyance of this water to the points of its ultimate use by consumers may have been installed." (Emphasis added.) Id., 624–25.

We read these cases, therefore, as standing for the *following propositions. First, when a party has, for the* prescriptive period, diverted all the water from a watercourse, it has established a prescriptive easement to divert all the water, regardless of whether the diversion was later reduced, or the scope of the diversion fluctuated. Second, if a party has, for that period, not diverted all, but only a portion, of the water from a watercourse, however, then it will have established an easement only for an amount that has become customary between the parties. Finally, if there is subsequently a significantly increased change in usage, that new use may be considered unreasonable, and a new prescriptive period would start to run as to that increased usage.

Applying this law to the facts of the present case, we conclude that Waterbury's prescriptive easement extends to a level that became "reasonable and customary" between itself and the defendants. Thus, Waterbury may have obtained a prescriptive easement for the maximum level of diversion that it can prove was maintained for a continuous fifteen year period. Waterbury has conceded, however, that it "does not . . . advocate that the scope of its prescriptive right exceeds those limitations [set in the 1921 contract] as interpreted by the trial court in its decision and as contained in the order for injunctive relief." Indeed, it is those levels that form the basis for the conclusion that Waterbury's use was as a matter of right. Therefore, a new trial is required for a determination of the scope of Waterbury's prescriptive easement, which, by Waterbury's concession, cannot exceed the levels set out in No. 252 of the 1893 Special Acts and the 1921 agreement between

Waterbury and Washington,[46] as interpreted by the trial court.

As we have stated, however, if after gaining a prescriptive easement against the defendants, Waterbury subsequently significantly increased its usage of the Shepaug River beyond the level of use embodied in the easement, that increased usage may be considered unreasonable and, as to it, a new prescriptive period would begin to run. If Waterbury maintained that increased level of usage for the prescriptive period, it could have acquired a new, increased easement. If, however, it did not maintain that increased level for the prescriptive period and it nonetheless continues to maintain that level—in effect, if Waterbury changed the operation of its water supply so as to *increase* its diversion *beyond* the scope of its easement[47]—the defendants may be able to receive an injunction of the degree of usage beyond the scope of the easement.

Thus, on the remand, if the trial court determines that Waterbury has exceeded the scope of its easement, without gaining a new easement, the court must deter-

---

[46] Although this agreement was only between Washington and Waterbury, because Waterbury has not challenged on appeal the trial court's riparian rights ruling with respect to Washington, we conclude that Waterbury has made this concession as to all other defendants as well.

[47] The trial court made several findings indicating that Waterbury had altered the operation of its water distribution system. In the trial court's first memorandum of decision, it stated: "The method of operating [Waterbury's] water system which gave rise to dissatisfaction, and then to the claims of [the defendants] in this suit, began soon after Waterbury built a water treatment plant in 1988 . . . ." Then, in its memorandum of decision on Waterbury's motion to reargue, the court added: "The evidence established that Waterbury's impairment of the defendants' riparian rights was not open and visible until Waterbury made major changes in the way it operated its water supply system in 1988–89, a period less than fifteen years prior to the institution of the defendants' counterclaim for injunctive relief against impairment of their riparian rights." This suggests that, beginning in 1988, Waterbury may have exceeded the scope of its previously established easement.

mine what remedial action it should take. In this connection, however, several preliminary questions must be addressed. Because the parties have not briefed these issues, we decline to decide them. In order, however, to aid the trial court in its resolution of this issue, should it arise, we offer the following guidance.

The trial court, first, must determine whether the defendants currently possess any riparian rights with respect to the flow down the Shepaug River, or if this common-law right has been superseded by legislative enactment. In 1982, with the enactment of the diversion act, Connecticut made a transition from a common-law riparian rights to a regulated riparian rights state. The major change effectuated by this transition is that, now, a state agency will determine, in advance, what diversions are allowed and to what extent, rather than having trial courts apply common-law riparian rights principles and resolve disputes through litigation. J. Christman, Water Rights in the Eastern United States (K. Wright ed., 1998) pp. 29–30; J. Dellapenna, 1 Waters and Water Rights, supra, § 9.03 (b) (1), p. 493 ("[r]egulated riparian statutes delegate to an administrative agency the right to decide who among competing applicants, will receive the right to use water, terms and conditions under which they will hold that right, and when, where, and how that right will end").

The diversion act requires that any party seeking to divert water after July 1, 1982, first obtain a permit from the department. When the legislature enacted the diversion act, it exempted all those current diversions from the permitting system, but ordered the holders of the existing diversions to register with the department "on a form prescribed by [it] the location, capacity, frequency and rate of withdrawals or discharges of said diversion and a description of the water use and water

system." General Statutes § 22a-368 (a).[48] The trial court found that Waterbury properly registered its Shepaug River diversion, and thus is exempt from the permitting requirements.[49] Section 22a-377 (c)-1 (c) (1) of the Regulations of Connecticut State Agencies provides: "Any person or municipality which registered a diversion pursuant to section 22a-368 of the General Statutes may maintain such diversion *only in accordance with the information provided in the registration form filed with the Commissioner.* Any person or municipality which registered a diversion pursuant to section 22a-368 of the General Statutes may not cause or allow any modification of such diversion, *including but not limited to an increase in withdrawal capacity,* without having first obtained a permit under sections 22a-365 to 22a-378, inclusive, of the General Statutes and 22a-377 (c)-2 of the Regulations of Connecticut State Agencies, unless such modification is exempt under section 22a-377 of the General Statutes or section 22a-377 (b)-1 of the Regulations of Connecticut State Agencies." (Emphasis added.)

[48] General Statutes § 22a-368 provides: "(a) Any person or municipality maintaining a diversion prior to or on July 1, 1982, shall register on or before July 1, 1983, with the commissioner on a form prescribed by him the location, capacity, frequency and rate of withdrawals or discharges of said diversion and a description of the water use and water system. Any such diversion which is not so registered may be subject to the permit requirements of sections 22a-365 to 22a-378, inclusive.

"(b) Notwithstanding any other provision of the general statutes or any special act to the contrary, no person or municipality shall, after July 1, 1982, commence to divert water from the waters of the state without first obtaining a permit for such diversion from the commissioner.

"(c) No permit shall be transferred to another person or municipality without the written approval of the commissioner."

[49] In 1988, Waterbury successfully amended its diversion to allow the sale of additional water to Wolcott. Currently, the department is reviewing two additional applications to expand the Shepaug River diversion, one to supply additional water to Middlebury, and the other to supply yet more water to Wolcott. The trial court, pursuant to § 22a-18, has retained primary jurisdiction over these proceedings.

The trial court must also determine whether these provisions constitute the sole means by which a party can remedy an excessive diversion, or if the legislature intended to allow riparians additional common-law remedies for grandfathered diversions. For example, the Regulated Riparian Model Water Code, intended "to create a complete, comprehensive, and well integrated statutory scheme for creating or refining a regulated riparian system of water law capable of dealing with the problems of the twenty-first century." J. Dellapenna, A.S.C.E., Regulated Riparian Model Water Code (1997) preface, p. x. With respect to the effects of grandfathering provisions in a permit system, the code provides: "Most states will choose to exempt some water uses from the permit system. In that case the Code provides that disputes involving such exempted water uses will be governed by the principle of reasonable use. In most cases, that rule is simply the prior law that already applied to them as the common law of riparian rights or the common law of underground water." Id., § 2R-1-04, commentary, p. 31. The diversion act, passed fifteen years before the publication of this code, contains no such provision. Therefore, the trial court must determine what ramifications, if any, result from this omission.

Additionally, if the trial court determines that the defendants retain riparian rights with respect to the exempted diversion, it must decide what standard will govern its examination of whether Waterbury violated these rights: either some type of reasonableness inquiry, as indicated in the model code[50] and provided for in General Statutes § 22a-373[51] of the diversion act, or "the

---

[50] See J. Dellapenna, Regulated Riparian Model Water Code, supra, § 6R-3-02, p. 240-45 ("[t]his section describes the factors that shall inform any decision by the State Agency regarding whether a proposed use is reasonable").

[51] General Statutes § 22a-373 provides: "(a) The commissioner shall, within one hundred and twenty days of the close of the hearing, make a decision either granting or denying the application as deemed complete in section

prior law that already applied to them as the common law of riparian rights"; J. Dellapenna, Regulated Riparian Model Water Code, supra, § 2R-1-04, commentary,

22a-371, or granting it upon such terms, limitations or conditions, including, but not limited to, provisions for monitoring, schedule of diversion, duration of permit and reporting as he deems necessary to fulfill the purposes of sections 22a-365 to 22a-378, inclusive. The commissioner shall state in full the reasons for his decision.

"(b) In making his decision, the commissioner shall consider all relevant facts and circumstances including but not limited to:

"(1) The effect of the proposed diversion on related needs for public water supply including existing and projected uses, safe yield of reservoir systems and reservoir and groundwater development;

"(2) The effect of the proposed diversion on existing and planned water uses in the area affected such as public water supplies, relative density of private wells, hydropower, flood management, water-based recreation, wetland habitats, waste assimilation and agriculture;

"(3) Compatibility of the proposed diversion with the policies and programs of the state of Connecticut, as adopted or amended, dealing with long-range planning, management, allocation and use of the water resources of the state;

"(4) The relationship of the proposed diversion to economic development and the creation of jobs;

"(5) The effect of the proposed diversion on the existing water conditions, with due regard to watershed characterization, groundwater availability potential, evapotranspiration conditions and water quality;

"(6) The effect, including thermal effect, on fish and wildlife as a result of flow reduction, alteration or augmentation caused by the proposed diversion;

"(7) The effect of the proposed diversion on navigation;

"(8) Whether the water to be diverted is necessary and to the extent that it is, whether such water can be derived from other alternatives including but not limited to conservation;

"(9) Consistency of the proposed diversion with action taken by the Attorney General, pursuant to sections 3-126 and 3-127; and

"(10) The interests of all municipalities which would be affected by the proposed diversion.

"(c) In making a decision on an application, the commissioner shall consider (1) capital expenditures and other resource commitments made prior to July 1, 1982, in connection with a proposed diversion, but such expenditures or commitments shall not be binding in favor of such proposed diversion and (2) proposed diversions recommended in any water supply plan developed pursuant to section 25-32d or coordinated water system plan prepared pursuant to section 25-33h in the same manner as proposed diversions not recommended in any such plan.

"(d) If a decision is not made in the time required pursuant to subsection (a) of this section, the application shall be deemed granted."

p. 31; which, prior to 1982 in Connecticut, was the natural flow body of law.

## III

## CONTRACT CLAIM

On its cross appeal, Washington contends that, although the trial court correctly concluded that Waterbury had breached its 1921 contract[52] with Washington, the remedy ordered by the trial court was not sufficient to cure the breach because it did not provide Washington with specific performance of the contract as it had requested.[53] Waterbury does not challenge, on appeal,

---

[52] See footnote 6 of this opinion.

[53] Waterbury claims that Washington only asked for "[a] permanent injunction prohibiting further breaches by Waterbury of the May 2, 1921 contract with the town of Washington." Therefore, Waterbury argues, the trial court was free to fashion appropriate equitable belief based on the equities of the situation. Although in its answer and revised counterclaim Washington asked for a permanent injunction, in its pretrial brief, it requested specific performance of the 1921 agreement. The trial court acknowledged this in its order, stating: "The only remedy that Washington seeks for what the court has found to be a repeated violation of the 1921 contract is an order of specific performance of the terms of the contract."

Additionally, Waterbury contends that Washington is not entitled to injunctive relief because Washington did not establish that: (1) Waterbury's actions resulted in irreparable harm; and (2) there was no adequate remedy at law. See *Tighe* v. *Berlin*, 259 Conn. 83, 87, 788 A.2d 40 (2002) (" 'party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law' "). In Washington's pretrial brief, however, it claimed that it was entitled to specific performance of the 1921 contract because: (1) the contract involved the sale of real property, namely, Washington's riparian rights in the Shepaug River; and (2) the loss of quality in the Shepaug River could not be valued in monetary terms. Waterbury did not challenge the type of relief sought by Washington in the trial court. In fact, in its closing argument, Waterbury stated that it had raised the defense of laches to the contract claim because Washington "only asked for equitable relief, so laches is the appropriate doctrine . . . ." Because Waterbury failed, before the trial court, to raise the claim that Washington was not entitled to injunctive relief for breach of the 1921 contract, we deem it to be waived. See Practice Book § 60-5 ("[t]he court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial"); *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 174, 530 A.2d 596 (1987) (failure of defendant to file motion to strike or request to revise charge fatal to attack on sufficiency of complaint).

the trial court's finding that it breached its contract with Washington. Thus, it, in effect, concedes the propriety of the trial court's finding of liability on the breach of contract claim. Its appellate position is limited to its response to Washington's claim regarding the remedy issued by the trial court. We therefore consider this aspect of the cross appeal on the basis that Washington has established that Waterbury breached the 1921 agreement with Washington. The only question, therefore, concerns the remedy issued by the trial court.

In response to Washington's cross appeal, Waterbury asserts that: (1) Washington has not provided an adequate record to review this claim; (2) even if the record is adequate, Washington has not met its appellate burden of demonstrating that the trial court's interpretation of the 1921 contract, upon which it ordered its relief, was clearly erroneous; and (3) the equitable relief fashioned by the trial court to cure Waterbury's breach of the 1921 contract was not an abuse of the trial court's discretion and, therefore, can not be disturbed. We remand this cross appeal to the trial court for imposition of a new relief order, albeit on a different ground than that asserted by Washington. Therefore, we need not address Waterbury's arguments.

After the trial court found that Waterbury had violated Washington's CEPA and contract rights, it issued one relief order[54] to redress *both* violations.[55] The trial court's seven part order contained two primary provisions. The first provision required Waterbury to restore

---

[54] See footnote 9 of this opinion.

[55] This relief order also was intended to cure Waterbury's violation of the other defendants' riparian rights. The trial court stated: "[T]he other riparian owners [excluding Washington; see footnote 42 of this opinion] are entitled to injunctive relief from [Waterbury's] violation of their riparian rights that is the same as the relief awarded pursuant to this court's finding of a violation of CEPA. . . . The court . . . exercises its discretion to curb that diversion only to the extent that it has been found to violate CEPA." (Citation omitted.)

"natural flow" to the Shepaug River between the months of May and October.[56] The fifth provision ordered Waterbury "not [to] divert water from the Shepaug watershed at any time when the Pitch Reservoir and also either the Morris Reservoir or the Wigwam Reservoir is full and either overflowing or discharging water through a pipe or by other means other than discharge to the water treatment plant of water to be supplied to customers for their water consumption needs."[57] The other five provisions of the trial court's order merely supplemented the court's injunction to restore natural flow.

Because, in part I of this opinion, we concluded that the trial court must evaluate Waterbury's alleged CEPA violation by determining whether the flow in the Shepaug River meets the requirements of the minimum flow statute, we undermined the trial court's order to Waterbury to restore natural flow to the Shepaug River as a remedy under CEPA. This necessarily raises a question of whether the trial court's remedy for Waterbury's contract violation may stand independently of the CEPA issues. We conclude that it may not.

[56] The trial court's first order had provided: "[Waterbury], its agents, servants and employees, are hereby permanently enjoined from operating [Waterbury's] water supply system and from diverting water from the west branch of the Shepaug River through the aqueduct tunnel in a manner that results in a daily flow at Peter's Weir or other suitable location for a stream gauge above the confluence with the Bantam River of less than the following stream flow in the indicated months:

| May: | 34.3 mgd |
| June: | 13.8 mgd |
| July: | 7.6 mgd |
| August: | 6.5 mgd |
| September: | 6.1 mgd |
| October: | 9.8 mgd" |

[57] Washington filed a motion for clarification, requesting that the trial court "make clear that Waterbury may not divert water from the Shepaug Reservoir when any one of the Pitch, Morris or Wigwam Reservoirs is full and overflowing." In its ruling on Washington's motion, the trial court reaffirmed that its order is "limited to a requirement not to divert when either (1) the Pitch and the Wigwam or (2) the Pitch and the Morris are simultaneously full and overflowing."

Both Waterbury and Washington have argued this appeal on the assumption that the fifth provision of the trial court's order was the only provision intended to address Waterbury's contract violation. Therefore, Washington framed its cross appeal, and Waterbury its rebuttal, on that premise. The trial court, however, clearly stated: "The relief ordered . . . reflects [the court's findings of a CEPA violation]. The *same relief is ordered* to address what this court has found to be [Waterbury's] breach of certain provisions of its 1921 contract with . . . Washington concerning limits on diversions of water from the Shepaug River . . . ." (Emphasis added.) In light of this unequivocal statement by the trial court, we would normally examine the entire trial court order to determine whether it provided Washington with the specific performance requested or, if not, whether the order, when viewed in its entirety, provided Washington with effectively the same relief as performance under the contract would have provided. See 5A A. Corbin, Contracts (1964) § 1137, p. 102 ("The performance that is required by the decree need not be exactly the same as that which was promised by the defendant. . . . An attempt to compel exact performance may involve the court in too great difficulty, a difficulty that can be avoided by using an indirect method of enforcement."). We conclude, however, that the invalidity of first provision of the trial court's order under the CEPA claim also undermines significantly its validity under the contract claim.

When the trial court fashioned its uniform remedial order, it did so on the premise that Waterbury's conduct violated both CEPA and its contract with Washington. It is apparent to us, moreover, that the entire order, particularly the first and fifth provisions, constituted a remedial mosaic. On this record, therefore, we cannot be confident that, had the CEPA claim been determined pursuant to the minimum flow statute—as it must, at

least initially, on the remand—the trial court would nonetheless have issued the same remedial order on the contract claim. We therefore leave to the proceedings on the remand the question of the scope of the remedy for Waterbury's violation of the contract.

The judgment is reversed and the case is remanded to the trial court for a new trial on the CEPA claim and the riparian rights claim, and for a new remedy on the contract claim.

In this opinion the other justices concurred.